Filed 6/6/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>GABRIEL ANTONIO MARTINEZ,<br><br>　　Defendant and Appellant. | H039398<br>(Monterey County<br>Super. Ct. No. SS111585) |

By way of an information filed on December 20, 2011, the Monterey County District Attorney charged Gabriel Martinez (appellant) with one count of murder (Pen. Code, § 12022.7, count one, victim Lisa Groveman), one count of involuntary manslaughter (Pen. Code, § 192, subd. (b), count two, victim Lisa Groveman), and three counts of selling, transporting, or furnishing a controlled substance (hereafter furnishing). (Health & Saf. Code, § 11352, subd. (a), count three methadone, count four, hydrocodone, and count five methadone.)[1]  Attached to both count three, and count four, was a personal infliction of great bodily injury (GBI) enhancement (Pen. Code, § 12022.7), victim Lisa Groveman.

Before trial, appellant waived his right to a jury trial in return for the prosecution's agreement to dismiss count one (murder) and a stipulated sentence of no more than 11

---

[1]　　The furnishing counts do not identify to whom the drugs were furnished. However, the parties and the court understood that the act of furnishing methadone to Ms. Groveman constituted count three, the act of furnishing hydrocodone (Vicodin) to Ms. Groveman constituted count four, and the act of furnishing methadone to Lejla Mavris constituted count five.

years, eight months in state prison if the court found him guilty;[2] the parties agreed that appellant could be sentenced on only one of the GBI enhancements since the two counts to which the GBI enhancements attached related to one victim. Appellant agreed to waive his Penal Code section 654 rights as to sentencing on the involuntary manslaughter count and GBI enhancements; and the parties waived any confrontation clause and hearsay objections as to two witnesses, Lejla Mavris and Thorston Hoffman.

On January 25, 2013, the court found appellant guilty of involuntary manslaughter and three counts of furnishing a controlled substance; the court found true the GBI enhancement attached to two of the furnishing counts—counts three and four. On February 26, 2013, the court sentenced appellant to a prison term of 11 years, eight months—the upper term of five years on count three (furnishing methadone to Ms. Groveman), with three years for the great bodily injury enhancement, plus consecutive terms of one year eight months for counts four and five (furnishing hydrocodone to Ms. Groveman and methadone to Lejla Mavris) and a consecutive one-year term for count two (manslaughter). The court imposed various fines and fees including, as relevant to this appeal, a $12,320 restitution fund fine imposed pursuant to Penal Code section 1202.4.

Appellant filed a timely notice of appeal.

On appeal, appellant's main contention is that as a matter of law the GBI enhancement cannot attach to the furnishing charge in count three; and that there was insufficient evidence to support the GBI enhancement. Second, appellant argues that the evidence was insufficient to support the verdict as to count five—furnishing methadone to Leija Mavris. Finally, appellant asserts that his trial counsel was ineffective in failing to object to the restitution fund fine since the court set the fine at an amount that was not applicable to conduct occurring in June 2011; and the fine is set above the statutorily

_____

[2] The court was careful to explain that this was not a slow plea.

authorized maximum. For reasons that follow we agree with appellant that the restitution fine must be modified, but as so modified we affirm the judgment.

*Facts and Proceedings Below*

In accordance with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

At approximately 11:12 a.m. on June 10, 2011, Officer Shaumbe Wright was sitting in his patrol car when appellant approached him. Appellant told Officer Wright that he thought " 'this girl over there is dead. Somebody needs to check.' " Appellant explained to Officer Wright that he did not know the girl; however, he went on to say that he and the girl had "gone out last night" and even though he was married they "hooked up." When Officer Wright asked how he knew the girl was dead, appellant said he found "stuff" oozing out of her mouth.

After appellant indicated which apartment the girl was in, Officer Wright knocked on the door, but there was no answer. The door was unlocked; when Officer Wright called inside no one answered. The officer entered the apartment and went to the bedroom where he saw a woman, later identified as Lisa Groveman, lying on her right side with her eyes open. She had some discoloration in her right jaw area and appeared to the officer to be deceased; Officer Wright could not find a pulse. According to Officer Wright, Ms. Groveman's body felt stiff and her lips were a different color. The officer did not see any fluid flowing from her mouth. When paramedics arrived and checked Ms. Groveman's condition they pronounced her dead.

At the scene, Officer Wright asked appellant if he would be willing to answer some questions and appellant responded that he was willing so to do. One of the questions that Officer Wright asked was if appellant had seen Ms. Groveman take any pills. Appellant said that he had seen her take pills at the restaurant where they met; this was before they came to the apartment. Appellant said that the pills were white and that he had given them to Ms. Groveman; specifically, he said had given her two

3

10-milligram methadone pills. Appellant told Officer Wright that he did not have any more pills. Appellant explained that he had met Ms. Groveman at Lalapalooza the evening of June 9, between 9:45 p.m. and 10 p.m. He talked with Ms. Groveman. Later, they met up at another bar called "Cibo's" at approximately 12:15 a.m. After meeting at Cibo's they went to Ms. Groveman's apartment and had sexual intercourse.

Appellant told Officer Wright that after intercourse, he and Ms. Groveman were sleeping and he noticed Ms. Groveman was " 'acting weird.' " He tried to wake Ms. Groveman, but she was "kind of groggy." Appellant said that he left the apartment at 8:00 a.m. He telephoned Ms. Groveman, but she did not answer her telephone. He returned to the apartment at 11:03 a.m. and knocked on the door. However, Ms. Groveman did not answer the door so he left; appellant explained that when he saw Officer Wright sitting in his patrol car he went back to the apartment. When he returned he opened the apartment door and went in. Appellant said he found Ms. Groveman on the bed, but he could not find a pulse; that is when he notified Officer Wright that possibly Ms. Groveman was dead.

After Ms. Groveman's body was discovered Detective Newby interviewed Lejla Mavris.[3] Ms. Mavris said that she met her friend Lisa Groveman at Lalapalooza on June 9, 2011. Appellant approached the bar and began talking to them. When Ms. Mavris asked appellant if he was in the military, he responded that he was in "pharmaceuticals." Ms. Groveman asked appellant what kind of pharmaceuticals and appellant responded "methadone." Ms. Groveman expressed interest in getting methadone and appellant left to get some. Ms. Groveman and Ms. Mavris decided to leave Lalapalooza and go to another bar, Cibo's. Appellant met them there. Appellant took some pills from his pocket and gave them to Ms. Groveman. Ms. Mavris saw Ms. Groveman ingest three pills. Ms. Mavris said that Ms. Groveman offered her some pills,

---

[3] The parties stipulated to the admission of Ms. Mavris's videotaped police interview. The videotape was played for the court.

but she refused because she was not sure what it was that appellant was giving them. A few moments later, Ms. Groveman ingested two more pills, and the two additional pills that Ms. Groveman had tried to give to her. Ms. Mavris said that Ms. Groveman took a total of seven pills, which Ms. Mavris thought were methadone; Ms. Mavris did not see appellant take any pills. Ms. Mavris tried to persuade Ms. Groveman to leave Cibo's, but Ms. Groveman refused to go and told Ms. Mavris not to judge her. Ms. Mavris left Cibo's with a friend—Ryan. Ryan offered to drive Ms. Groveman home. According to Ms. Mavris she texted and telephoned Ms. Groveman several times to find out if she got home safely, but she never got a response.[4]

Ryan Lama testified that he and another friend met Ms. Mavris and Ms. Groveman at Lalapalooza. Mr. Lama was close friends with Ms. Mavris; he met Ms. Groveman for the first time that evening. Mr. Lama said that the women finished three bottles of wine and possibly had a couple more drinks. They were happy and having a good time. By the end of the evening Ms. Groveman was intoxicated. Appellant started talking to Ms. Mavris and Ms. Groveman; Mr. Lama thought that appellant was intoxicated. After a couple of hours the group moved to Cibo's. They had another round of drinks there. Appellant and Ms. Groveman were talking, but although Mr. Lama could not hear what they were saying, he saw them passing drugs. Specifically, Mr. Lama said that he saw Ms. Groveman get some white pills from appellant and he thought that Ms. Groveman tried to give some to Ms. Mavris. Ms. Groveman put some pills in her mouth, possibly two pills. Mr. Lama decided to leave Cibo's at around 1:30 a.m. and offered to drive Ms. Groveman home, but she said she wished to remain and told Mr. Lama not to judge her. Mr. Lama testified that he was concerned the two women had had too much to drink. Mr. Lama left Cibo's with Ms. Mavris.

---

[4] Phone records revealed that Ms. Groveman and Ms. Mavis had a four minute telephone conversation at approximately 1:37 a.m. However, no evidence concerning the content of the conversation was presented at trial.

Peter Inzerillo, the bouncer at the Britannia Arms, testified that at one point Ms. Groveman tried to get into his bar, but because she appeared intoxicated he refused to let her in. He told Ms. Groveman that she had had enough to drink. Ms. Groveman told Mr. Inzerillo that she was only going with appellant because he had Vicodin. Mr. Inzerillo saw Ms. Groveman walk down the street with appellant; they were kissing and being affectionate.

The June 9, 2011 video surveillance footage from Cibo's was played for the court. The video showed appellant talking to Ms. Groveman and Ms. Mavris at the bar. At 12:10 a.m. appellant reached into his pocket and pulled something out. A few moments later Ms. Groveman ingested the something. Later, at approximately 31 minutes after midnight, Ms. Mavris and Ms. Groveman can be seen joining appellant who put his hand into his pocket and appeared to remove something. Ms. Groveman appeared to look down at the something then appeared to put the something in her mouth. Subsequently, Ms. Groveman and Ms. Mavris appear to be discussing something, Ms. Mavris shakes her head; it appeared she handed something back to Ms. Groveman, who then placed something in her mouth again. Appellant was observing what was taking place between Ms. Groveman and Ms. Mavris. At approximately 12:53 a.m. Mr. Lama and Ms. Mavris left the bar. At approximately 1 a.m. appellant and Ms. Groveman left the bar.

A videotape of appellant's two police interviews was played for the court. During the interviews, appellant told the police that he works for a company that returns expired drugs from pharmacies back to the manufacturer. He packages the drugs for shipment to the manufacturers. On June 9, 2011, he was in Monterey for work and was staying at a hotel.

Appellant explained that he went to Lalapalooza and saw Ms. Groveman with her friend. He went up to them and started talking. He and Ms. Groveman exchanged telephone numbers. They met up at Cibo's at approximately 12:15 a.m. Appellant said he had two drinks. Sometime after 1 a.m. appellant offered to take Ms. Groveman

6

home—he felt he ought to drive because he had had only a couple of drinks, and so he drove Ms. Groveman's car to her apartment. Appellant admitted that he saw Ms. Groveman have several drinks over the course of the night; he could not estimate how many. At Ms. Groveman's apartment, they had sexual intercourse. Afterwards they were lying in bed and Ms. Groveman was mumbling and rambling; she was not making much sense. While she was sleeping she was making snorting sounds and breathing irregularly. Appellant said he tried to wake her, but she did not want to be bothered. He thought about calling 911, but she seemed to still be responsive and breathing on her own. At approximately 8 a.m. he told Ms. Groveman he was leaving and that he would telephone her. Earlier, he had dressed Ms. Groveman in her black top and pants. Ms. Groveman mumbled as he was leaving. She was drooling and perspiring. Appellant said that he placed her telephone next to her so she would hear it ring.

Appellant told the police that he went back to his hotel room and slept for a little while. At 10:30 a.m. he decided to go back to Ms. Groveman's apartment because he had tried telephoning her; he had left a voicemail. When he reached her apartment, he saw a police officer parked nearby. Appellant explained that he knocked on the door of Ms. Groveman's apartment, but after there was no response, he left. As he drove down the street he saw the officer again; he decided to turn around because of "intuition"— "something just didn't feel right." Appellant said that he knocked on the door of the apartment again, but then remembered that the door had been left unlocked. He walked in and saw Ms. Groveman lying on her back and side; her lips were purple. "Stuff" was coming out of her mouth. He tried to feel for her pulse.

Appellant told the police that Ms. Groveman had been drinking at the bars, that she asked him what he did for a living and if he had any drugs. When he left Lalapalooza he went to get drugs. Appellant admitted giving Ms. Groveman two 10-milligram methadone pills at Cibo's, which Ms. Groveman ingested. Appellant said he gave Ms. Mavris two pills, he assumed she took them, but was not sure. Appellant said he had a

7

total of six pills when he was at the bar; he had taken a couple of methadone pills earlier in the evening. Appellant explained that he was addicted to painkillers as a result of some sport injuries. Appellant said he got the drugs from a friend, not through his work.

The police asked appellant about a small white towel that was found on Ms. Groveman's bed. Appellant explained that he had put the towel there to wipe Ms. Groveman's drool while she was sleeping; earlier he had used the towel to wipe himself after they had intercourse. When asked about a stain that was on the bottom bed sheet, appellant said that it could have come from Ms. Groveman's bodily fluids during intercourse. Appellant said that he was "slightly" concerned about the affect the methadone had on Ms. Groveman, but said she had been acting normally during the evening. Appellant told the police that he did not have any more methadone. He said he was aware that methadone is a depressant that suppresses the central nervous system, respiration and the heart rate. Further, he admitted knowing that methadone combined with alcohol was more powerful than it would be alone.

Subsequently, appellant told the police that possibly there were some more pills in the dresser drawer in his room. Pursuant to a search warrant, officers searched appellant's hotel room and located a number of pills in a small bag inside a rolled-up sock. In all, the police located 21 methadone hydrochloride pills, two hydrocodone-acetaminophen pills (Vicodin) and one methadone pill from a different manufacturer. Appellant's cellular telephone showed that he had texted Ms. Groveman at midnight and she asked him to come to Cibo's. In addition, the telephone showed that appellant had telephoned Ms. Groveman at 8:55 a.m. the next morning; the call lasted 21 seconds.[5]

Soon after Ms. Groveman's body was found, Sergeant William Clark arrived at the apartment. He photographed the scene. Ms. Groveman's body was on her bed with her cellular telephone a few inches from her face. She was wearing a black tank top and tight

---

[5] Detective Newby assumed that appellant left a voicemail for Ms. Groveman but he was never able to retrieve the message.

8

black pants with no undergarments.  Behind her body, in the corner of the bed, was a pillow with a white towel lying against it.  There was a faint circular stain near the pillow and towel area.  Behind Ms. Groveman's back there was a stain on the bed sheet, orange colored, faint and uneven; the stain was located in front of the pillow and towel.  All the stains were dry.  The stain on the bed sheet could not be dated and was not tested.  A photograph taken by Sergeant Clark showed a small amount of foam or purge on the inner portion of Ms. Groveman's mouth; and it appeared the fluid had caused Ms. Groveman's hair to stick to her right cheek.  Sergeant Clark testified that in his experience the fluid coming from Ms. Groveman's mouth was consistent with a drug overdose.  Sergeant Clark said officers located various prescription and generic medications in the apartment, but no methadone or Vicodin was located there.

Forensic pathologist Dr. John Hain performed Ms. Groveman's autopsy.  He testified that Ms. Groveman's lungs were heavy from accumulated fluid and there was some foam in her airway; her bladder was extremely distended.  He said this was typical in a victim who had overdosed on sedatives.  Ms. Groveman's toxicology results showed a high level of methadone and hydrocodone and a moderate level of alcohol.

Dr. Hain stated that with a sedative overdose the victim's breathing decreases and the oxygen level in the blood starts to decrease; this has an effect on multiple organs.  In particular, the lungs start to leak fluid and this causes pulmonary edema, which is fluid buildup in the lungs.  Dr. Hain explained that as the fluid builds it tends to leak out of the airway usually as foam; the foam has proteins in it.  Ms. Groveman had small bubbles of "pernicious fluid" in her airways.  People who have overdosed have a propensity to vomit and aspirate stomach contents; when this happens there is an irritant effect in the lungs and they respond by pouring out more fluid.  Dr. Hain saw evidence of both these causes of edema in Ms. Groveman; there were food particles in the large airways and residual food in her stomach.

9

Based on Ms. Groveman's blood toxicology results, Dr. Hain concluded that Ms. Groveman had drunk alcohol a number of hours before she died. The level of methadone in her system was 0.38 milligrams per liter, which was in the fatal range for a non-tolerant user.[6] The level of hydrocodone was 0.08 milligrams per liter, a level that was especially elevated for someone who did not have tolerance for the drug. The hydrocodone itself was not fatal but in combination with the other drugs and alcohol could be lethal. Dr. Hain concluded that the cause of death was methadone, hydrocodone and alcohol intoxication. He could not estimate an exact time of death, but indicated that based on the signs of rigor mortis, Ms. Groveman died sometime between 5 a.m. and 8:00 a.m. He opined that by 8 a.m. Ms. Groveman was either dead or deeply unconscious and close to death. As to the quantity of pills that Ms. Groveman ingested, based on the level of the drugs in her blood Dr. Hain indicated that Ms. Groveman ingested six or seven 10-milligram methadone pills and six to eight 10-milligram hydrocodone pills.

According to Dr. Hain, a person observing someone with pulmonary edema would hear a drowning sound—gurgling, raspy breathing—and see fluid coming from the mouth or nose. There would be visible signs of lethargy. Dr. Hain testified that the reddish brown stain found on Ms. Groveman's bed sheet was consistent with the type of stain that could result if a person had pulmonary edema and was purging fluid. The proteins in the fluid give the fluid a yellowish or amber appearance; often red blood cells are present. There was no evidence that Ms. Groveman had pulmonary disease or chronic asthma.

---

[6]     Dr. Hain explained that to build tolerance a person would have to have been taking the drug regularly, within the previous few weeks and for at least a few days. Ms. Groveman's blood chemistry did not show that she had taken methadone earlier in the day on June 9th or the previous day.

Dr. Hain opined that if emergency personnel had been summoned when Ms. Groveman was having trouble breathing, she could have been saved, even if she was experiencing pulmonary edema. Further, he stated that the towel that was found close to Ms. Groveman's pillow had stains that were consistent with fluid from the lungs; the stain was similar in color to the stain on the bed sheet, but he could not be absolutely certain of the source of the stain.

<em>Discussion</em>

*GBI Enhancement*

Appellant contends that the GBI enhancements must be reversed because the trial court had no authority to impose them; alternatively, there was insufficient evidence to support them.

*Background*

At the time appellant waived his Penal Code section 654 (hereafter 654 waiver) rights in exchange for the dismissal of the murder charge and a potential maximum sentence of 11 years, eight months, the parties and the trial court discussed the effect of the 654 waiver. Specifically, defense counsel explained, "There's a 654 waiver involved here. And let me explain how that would work as I understand it. If the judge found Mr. Martinez guilty of the involuntary manslaughter and found that the 12022.7(a) was applicable as to Count 3 . . . or 4, normally he could not be punished for both the involuntary manslaughter and under that enhancement. We're waiving that under 654. What we're not waiving - - and I want to be very clear about this . . . is we take the position that as a matter of law - - and we'll argue this in front of Judge Culver - - that if you are convicted of involuntary manslaughter, the GBI could not apply to the furnishing charge." The prosecutor agreed that the issue could be "litigated, argued and appealed even for that matter." However, the prosecutor went on to say "as far as whether the defendant can be convicted of both a 192 and 11352 with a 12022.7, I would agree that typically you couldn't, because it's dual use of facts. The same one dead human being

11

cannot be the source of a conviction or punishment for two different counts. That's being waived. We're agreeing that - - I don't think there's any prohibition on a conviction on both. There's a prohibition on a punishment for both."

Defense counsel stated that it was his belief "as a matter of law . . . that if one were convicted of involuntary manslaughter and furnishing and the victim was exactly the same, you . . . couldn't add on the enhancement. You certainly could convict him of both of the substantive crimes, but as a matter of law you couldn't add on the enhancement. . . . [¶] . . . [I]f the victim of the furnishing -- in other words, the receiver, the furnishee is the same person who dies as a result of in this case a drug overdose, that in that case . . . the GBI could not apply."

During trial, defense counsel continued to challenge the legality of the GBI enhancements; counsel argued that as a matter of law they could not be imposed where there is a manslaughter conviction. Specifically, counsel argued that there was no authority for adding a GBI enhancement to a charge of furnishing narcotics or dangerous drugs to a victim who overdoses and thereafter dies.

After considering the trial briefs and argument by counsel on the GBI issue, the trial court concluded that it could legally impose a GBI enhancement on the furnishing charge. The court based its conclusion on the language of Penal Code section 12022.7 (hereafter section 12022.7) and case law applying the enhancement where a defendant was convicted of murder or manslaughter.

Appellant contends that the court had no authority to impose the GBI enhancements since the enhancements were premised on Ms. Groveman's death and appellant had already been convicted of manslaughter as a result of the death.

As relevant to this issue, section 12022.7 provides, "(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years. . . . [¶] (f) As used

12

in this section, 'great bodily injury' means a significant or substantial physical injury. [¶] (g) This section shall not apply to murder or manslaughter or a violation of Section 451 or 452."[7]

Appellant argues that contrary to the trial court's conclusion, subdivision (g) of section 12022.7 "does not merely limit imposition of a GBI enhancement when it is directly attached to a homicide charge." Rather, appellant asserts that subdivision (g) "more broadly prohibits the enhancement's imposition when the alleged injury is the victim's death, and the defendant has been convicted of murder or manslaughter for that death." Appellant contends that the "charge to which the enhancement is attached is of no consequence."

The question presented involves statutory interpretation, which presents a question of law subject to de novo review. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76–77.) First, we look to the words of the statute, giving them their usual and ordinary meaning. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1172.) If the language of the statute is susceptible to more than one reasonable construction, we can look to the legislative history to aid in ascertaining the legislative intent. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055.) However, when statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. (*People v. Weidert* (1985) 39 Cal.3d 836, 843.)

" 'A plain reading of Penal Code section 12022.7 indicates the Legislature intended it to be applied broadly' [citation], and therefore the statute itself sets out the only criminal offenses—murder, manslaughter, arson, and unlawfully causing a fire, each of which incorporates enhanced sentencing for such injury—that are not subject to a finding of great bodily injury [citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 66, fn. 3.)

---

[7]    Penal Code section 451 pertains to arson that causes great bodily injury and Penal Code section 452 pertains to unlawfully causing a fire that caused great bodily injury.

Appellant's contention that regardless of which offense the GBI enhancement attaches, the enhancement cannot apply to a homicide victim where a defendant is convicted of murder or manslaughter, reads subdivision (g) too broadly. Subdivision (g) of section 12022.7 plainly states "[t]his section shall not apply to murder or manslaughter . . . ." If we were to accept appellant's argument we would have to read that sentence as saying "this section shall not apply to *any case where a defendant is charged with* murder or manslaughter." As the California Supreme Court has explained, " 'insert[ing]' additional language into a statute 'violate[s] the cardinal rule of statutory construction that courts must not add provisions to statutes. [Citations.]' " (*People v. Guzman* (2005) 35 Cal.4th 577, 587.)

To support his position, appellant relies on *People v. Verlinde* (2002) 100 Cal.App.4th 1146 (*Verlinde*). Appellant's reliance on *Verlinde* is misplaced. The Court in *Verlinde* explained section 12022.7, subdivision (g) as follows: "The statutory exception for murder and manslaughter [citation] is intended to bar imposition of an enhancement for the injuries inflicted on the homicide victim, who obviously has suffered great bodily injury. Thus, the statutory exemption prevents prohibited dual punishment for the same *crime*." (*Id.* at p. 1168, italics added.) Contrary to appellant's argument, the *Verlinde* court did not announce a broad sweeping rule that in any case where a defendant is convicted of murder or manslaughter a GBI enhancement cannot be applied to a different charge involving the same homicide victim.

Two cases, *People v. Brown* (2001) 91 Cal.App.4th 256 (*Brown*), and *People v. Corban* (2006) 138 Cal.App.4th 1111 (*Corban*), persuade us that our interpretation of section 12022.7, subdivision (g) is correct. Although neither case is directly on point, the defendant in one case was convicted of second degree murder and the defendant in the other case was convicted of involuntary manslaughter; in both cases the defendant was convicted of another felony (involving the same victim of the murder or manslaughter

14

charge) to which a great bodily injury enhancement was attached. (*Brown*, *supra*, 91 Cal.App.4th at p. 259; *Corban*, *supra*, 138 Cal.App.4th at p. 1114.)

In *Brown*, *supra*, 91 Cal.App.4th 256, a man met the defendant in San Diego, where they discussed the amputation of the man's leg. The defendant agreed to perform the amputation at a clinic in Mexico, which he did. The defendant was not licensed to practice medicine in either California or Mexico. After the amputation the man returned to California, where he died two days later. (*Id.* at pp. 260–261.) The defendant was convicted of second degree murder and the unlawful practice of medicine. As to the unlawful practice of medicine count, the jury found true the allegation that appellant inflicted great bodily injury on a person 70 years of age or older within the meaning of section 12022.7, subdivision (c).[8] (*Id.* at p. 259.) On appeal, among other things, the defendant contended that the court erred in imposing the great bodily injury enhancement as to the unlawful practice of medicine conviction returned by the jury. (*Ibid.*) The defendant argued that the great bodily injury enhancement could not be applied to an offense an element of which is the infliction of great bodily injury. (*Id.* at p. 271.)

Notwithstanding the fact that the defendant in *Brown* had been convicted of murder of the same victim, the Fourth District Court of Appeal concluded that the GBI enhancement under section 12022.7 subdivision (c), which was attached to the unlawful practice of medicine, could be imposed because GBI was not an element of the offense. (*Brown*, *supra*, 91 Cal.App.4th at p. 272.)

---

[8] At the time the defendant in *Brown* committed his crime, subdivision (c) of section 12022.7 provided: "Any person who personally inflicts great bodily injury on another person who is 70 years of age or older other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of five years, unless infliction of great bodily injury is an element of the offense of which he or she is convicted." (Stats.1995, ch. 341, § 1.) At the time, subdivision (g) of section 12022.7 provided, as it does currently, "This section shall not apply to murder or manslaughter or a violation of Section 451 or 452." (Stats.2010, ch. 711, § 5, operative Jan. 1, 2012.)

Similarly, in *Corban*, *supra*, 138 Cal.App.4th 1111, the First District Court of Appeal upheld a GBI enhancement that was attached to a child endangerment charge where the defendant was convicted of the involuntary manslaughter of the same child. (*Id*. at p. 1120.) In *Corban*, the defendant left her two-year-old son Liam in a locked car with the windows closed on a hot day; he died from heat exposure. Defendant pleaded no contest to involuntary manslaughter and felony child endangerment (Pen. Code, § 273a, subd. (a)) of Liam, and to felony child endangerment of Jaden, the defendant's four-year-old son, who was left in the car with Liam, but survived. Defendant admitted personally inflicting great bodily injury on Liam (Pen. Code, § 12022.7, subd. (d)),[9] as an enhancement to the endangerment charge. She was sentenced to seven years four months in prison, representing the lower term of two years for endangering Liam, four years for personal infliction of great bodily injury on Liam, and one year four months (one-third the midterm) for endangering Jaden; sentence on the involuntary manslaughter count was stayed pursuant to section 654. (*Corban*, *supra*, at p. 1114.)

On appeal, the defendant in *Corban* contended that she could not lawfully be charged with a section 12022.7, subdivision (d) great bodily injury enhancement because a more specific enhancement, the one provided in Penal Code section 12022.95, applied in a case such as hers where the child endangerment resulted in death. (*Corban*, *supra*, at p. 1114.) The *Corban* court held that neither enhancement was more specific than the other; the prosecution had the discretion to allege either one. In finding that the enhancement as to the child endangerment count was properly imposed, the court indicated that "those who endanger very young children must be exposed to punishment

---

[9]    Currently, and at the time the defendant in *Corban* committed her crime, subdivision (d) of section 12022.7 provided, "Any person who personally inflicts great bodily injury on a child under the age of five years in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for four, five, or six years." (Stats.2002, ch. 126, § 6; Stats.2010, ch. 711, § 5, operative Jan. 1, 2012.)

16

under section 12022.7, subdivision (d) to put the penalty for the death of such a child on par with that for their great bodily injury." (*Id*. at p. 1119.) Again, the fact that the defendant in *Corban* had been convicted of involuntary manslaughter did not prevent the GBI attaching to another offense involving the same victim.

The fact that neither *Brown* nor *Corban* addressed the exact issue that appellant raises here, is of no moment. Where murder and manslaughter are concerned, the subdivision exempting murder and manslaughter from the reach of section 12022.7 has been in existence since the statute was first enacted.[10] (Stats.1995, ch. 341, § 1.) We cannot believe that two of our sister courts, one in a murder case and one in a manslaughter case, would have upheld a GBI enhancement being attached to another felony involving the same victim, if appellant's interpretation of subdivision (g) was correct.

In sum, appellant's interpretation of subdivision (g) of section 12022.7 is not supported by the plain language of the statute and by case law. Given appellant's Penal Code section 654 waiver and no statutory prohibition on imposing the GBI enhancement on the furnishing charges, the trial court properly imposed the enhancement on count three.

Appellant's argument that there was insufficient evidence that he "personally inflicted" great bodily harm on Ms. Groveman is not well taken.

In reviewing a claim of insufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Furthermore, when we review the evidence in the light most favorable to respondent, we

---

[10] Originally, subdivision (f) exempted only murder and manslaughter from the reach of a section 12022.7 enhancement. (Stats. 1995, ch. 341, § 1.)

"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)

"[T]he meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning. Commonly understood, the phrase 'personally inflicts' means that someone 'in person' [citation], that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.' [Citation.]" (*People v. Cross, supra,* 45 Cal.4th at p. 68.)

Certainly, "for the [GBI] enhancement to apply, the defendant must be the *direct, rather than proximate,* cause of the victim's injuries." (*People v. Warwick* (2010) 182 Cal.App.4th 788, 793.) As the court in *People v. Rodriguez* (1999) 69 Cal.App.4th 341 noted, "[t]o 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury." (*Id.* at p. 349.)

Appellant concedes that the combination of drugs caused Ms. Groveman's death; he admits that Dr. Hain's testimony established that the amount of methadone was in the lethal range and that the level of hydrocodone, when combined with the amount of methadone, was also in the lethal range. Appellant argues however, that "the relevant question is whether his act of furnishing methadone and Vicodin—as opposed to Ms. Groveman's act of volitionally ingesting the drugs—directly caused her death."

Appellant argues that the decision in *People v. Rodriguez, supra*, 69 Cal.App.4th 341 (*Rodriguez*), is most helpful to his position.

In *Rodriguez,* the defendant "was being transported with other prisoners from a police station to a jail. He escaped custody and began running away, instigating a chase by Officer Martin. At one point during Martin's pursuit of Rodriguez, a bystander handed Rodriguez a bicycle to aid in his escape. Martin tackled Rodriguez on the bicycle and both men fell to the ground. Martin testified that during the tackle he hit his head, either on the ground, the concrete sidewalk, or the lamppost, and was knocked

18

unconscious." (*Rodriguez, supra,* 69 Cal.App.4th at p. 346.) The *Rodriguez* court reversed a great bodily injury finding because "in this case Rodriguez did not initiate a struggle or any other physical contact with the officer. Nor can we find evidence in this record of any act by Rodriguez that directly caused the officer injury." (*Id.* at p. 351.) "[A]lthough the record contains evidence Rodriguez proximately caused the officer's injury, we conclude that, as a matter of law, this record does not establish that Rodriguez directly inflicted the injury. According to the record, Rodriguez did not push, struggle or initiate any contact with the officer . . . . Instead, the evidence shows that Rodriguez was trying to escape arrest on a bicycle and the officer injured himself when he tackled Rodriguez." (*Id.* at p. 352.) We are not persuaded that *Rodriguez* adds anything to appellant's argument. In contrast to this case, in *Rodriguez,* there was no evidence the defendant had personally acted to cause the injuries to the victim.

Simply put, appellant's argument that the enhancement is inapplicable because Ms. Groveman made a volitional choice that directly caused her death is unavailing. More than one person may be found to have directly participated in inflicting a single injury. For example, in *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1210–1211, the defendant who held the victim while a codefendant struck her was found directly responsible for the injury the victim suffered when she fell while pulling away. As our Supreme Court explained in *People v. Modiri* (2006) 39 Cal.4th 481, while construing the identical phrase "personally inflict great bodily injury" in Penal Code section 1192.7, subdivision (c)(8):[11] "*The term 'personally,' which modifies 'inflicts' . . . does not mean exclusive* here. This language refers to an act performed 'in person,' and involving 'the actual or immediate presence or action of the individual person himself (as opposed to a

---

[11] Penal Code Section 1192.7, subdivision (c)(8), defines a "serious felony" as "any felony in which the defendant *personally inflicts great bodily injury* on any person, other than an accomplice, or any felony in which the defendant personally uses a firearm . . . ." (Italics added.)

19

substitute, deputy, messenger, etc).' [Citation.] Such conduct is '[c]arried on or subsisting between individual persons directly.' [Citations.] Framed this way, the requisite force must be one-to-one, but does not foreclose participation by others. [¶] In short, nothing in the terms 'personally' or 'inflicts,' when used in conjunction with 'great bodily injury' . . . necessarily implies that the defendant must act alone in causing the victim's injuries." (*People v. Modiri, supra,* at p. 493, italics added.)

Appellant may not have forced Ms. Groveman to take a lethal quantity of drugs, but he supplied her with them knowing that the drugs were more dangerous when combined with alcohol. Appellant continued to supply drugs to Ms. Groveman as he watched her continue to consume alcohol and become intoxicated, so intoxicated that appellant felt she was not in any condition to drive and he drove her car to her apartment. Appellant's act of personally providing Ms. Groveman a lethal quantity of drugs while she was in an intoxicated state was the direct cause of Ms. Groveman's death. As the trial court found, "Ms. Groveman would not have died had Mr. Martinez not provided her with all the drugs that he had that night."

In sum, there was substantial evidence that appellant personally inflicted GBI on Ms. Groveman.

*Alleged Insufficient Evidence to Support Count Five*

Appellant contends that his conviction on count five, furnishing the methadone to Lejla Mavris, must be reversed because there was insufficient evidence as his conviction was based solely on his statement to the police without independent proof of the corpus delicti of the offense.

We reiterate, "[i]n assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "Reversal . . . is unwarranted unless it appears 'that upon no

20

hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]"  (*Ibid.*)

Appellant argues that the corpus delecti of the alleged crime was not established independent of his extrajudicial statements.  Appellant asserts that in finding him guilty on count five, the court "largely relied" on his admission that he provided the methadone to Ms. Mavris.

Certainly, "[i]n every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself--i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.  [Citations.]"  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.)  "Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law.  [Citations.]"  (*Id*. at p. 1169.)

Nevertheless, as to independent proof, "the quantum of evidence required is not great, and 'need only be "a slight or prima facie showing" permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues.' [Citation.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 722.)  " 'The inference [that a crime has been committed] need not be "the only, or even the most compelling, one . . . [but need only be] a *reasonable* one." ' [Citations.]"  (*Ibid.*)  We agree with the People that here there was circumstantial evidence of the furnishing offense independent of appellant's statement to the police.

According to Ms. Mavris's statement to the police, when she first met appellant he said that he was in "pharmaceuticals"; and after Ms. Groveman asked appellant what kind, he said methadone.  Then, after Ms. Groveman asked appellant if he could get some methadone, appellant left the bar.  Later, at Cibo's, appellant gave the methadone to Ms.

21

Groveman and Ms. Groveman tried to give her some of the methadone pills. Ms. Mavris said she refused to take the pills because she had no idea what appellant had given Ms. Groveman. Ms. Mavris was under the impression that appellant had given Ms. Groveman the methadone to give to her.[12]

As noted, the June 9, 2011 video surveillance footage from Cibo's was admitted into evidence. The video showed appellant talking to Ms. Groveman at the bar at 10 minutes past midnight. Then the video showed appellant reach into his pocket and pull something out. A few moments later Ms. Groveman ingested the something. Later, at approximately 31 minutes after midnight, Ms. Mavris and Ms. Groveman can be seen joining appellant who put his hand into his pocket and appears to remove something. Ms. Groveman appears to look down at the something then appears to put the something in her mouth. Subsequently, Ms. Groveman and Ms. Mavris appear to be discussing something, Ms. Mavris shakes her head and appears to hand something back to Ms. Groveman, who places the something in her mouth again.

Ryan Lama testified that when they were all at Cibo's he saw appellant and Ms. Groveman talking and saw appellant pass drugs to Ms. Groveman and then Ms. Groveman may have passed drugs to Ms. Mavris.

We can reasonably infer from all this evidence that appellant supplied a controlled substance to Ms. Mavris in violation of Health and Safety Code section 11352, subdivision (a). In fact the court pointed to *both* appellant's statement to the police and the evidence from the video surveillance footage to support the furnishing charge. Specifically, the court found that the appellant's "own statement that he provided the methadone to Lejla Mavris" were "borne out in the interview done at the police department, as well as the video . . . ."

The quantum of independent evidence was sufficient to provide the independent

---

[12]    The court made a finding that Ms. Mavris's statement to the police was "compelling" and "truthful."

22

corroboration needed to support the conviction on count five.

*Restitution Fund Fine*

At sentencing, the court ordered a restitution fine "in the amount of $280 times the number of years, times the number of felony counts, for a total restitution fine in the amount of $12,320."  The probation officer's report recommended that appellant "be required to pay a restitution fine of $280.00 times the number of years, times the number of felony counts, for a total restitution fine of $12,320.00 (PC §1202.4(b)(2))."

Appellant challenges the amount of the restitution fund fine on the ground that his offenses were committed in June 2011 and the court improperly used the formula that came in to effect on January 2013.  He argues that when he committed his crimes the minimum restitution fine was $200.

At the outset, we note that the record supports the inference that the court intended to use the formula in Penal Code section 1202.4, subdivision (b)(2), which provides currently, "In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."[13]  The court used the formula, and as can be seen, the probation officer's report recommended the restitution fine be set pursuant to the formula.

Effective January 1, 2013, the minimum restitution fine in section 1202.4,

---

[13]    Currently, paragraph (b)(1) provides, "If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three hundred dollars ($300) starting on January 1, 2014, and not more than ten thousand dollars ($10,000)." (Pen. Code, § 1202.4, subd. (b)(1).)  At the time of appellant's offenses paragraph (1) of subdivision (b) of Penal Code section 1202.4 provided "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony . . . ."  (Stats. 2010, ch. 351, § 9, eff. Sept. 27, 2010.)

23

subdivision (b)(1), increased to $280. (Stats. 2012, ch. 868, § 3; Stats. 2012, ch. 873 (S.B.1479), § 1.5.) The trial court in this case imposed a $280 fine multiplied by the number of years of imprisonment, multiplied by the number of felony counts, although the minimum restitution fine was $200 at the time appellant committed his offenses. (Stats. 2010, ch. 351, § 9, eff. Sept. 27, 2010.)

The prohibition against ex post facto laws applies to restitution fines. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248; *People v. Souza* (2012) 54 Cal.4th 90, 143 [it is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions].) Nevertheless, the rule of forfeiture is applicable to ex post facto claims (see *People v. White* (1997) 55 Cal.App.4th 914, 917), particularly where any error could easily have been corrected if the issue had been raised at the sentencing hearing.

Nevertheless, appellant argues that his trial counsel rendered ineffective assistance by failing to object to the incorrect minimum amount used to calculate the final total. Respondent concedes that the fine must be reduced.

To prevail on an ineffective assistance of counsel claim, appellant must prove two elements: (1) trial counsel's deficient performance and (2) prejudice as a result of that performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

Deficient performance is established if the record demonstrates that counsel's representation "fell below an objective standard of reasonableness under the prevailing norms of practice." (*In re Alvernaz* (1992) 2 Cal.4th 924, 937.) Generally, in assessing performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland, supra,* 466 U.S. at p. 689.) Courts are "highly deferential" to the tactical decisions made by counsel. (*Ibid.*)

Normally, "the failure to object is a matter of trial tactics that an appellate court will seldom second-guess [citation] . . . ." (*People v. Carter* (2003) 30 Cal.4th 1166,

24

1209.)  However, an exception exists where "there simply could be no satisfactory explanation" for counsel's failure to object.  (*Id.* at p. 1211.)  Furthermore, with respect to unfavorable sentencing issues, "a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent.  [Citations.]"  (*People v. Scott* (1994) 9 Cal.4th 331, 351; see also *People v. Le* (2006) 136 Cal.App.4th 925, 936 [finding ineffective assistance of counsel where counsel failed to object to a fine calculation in which the court added counts where a punishment should have been stayed pursuant to Penal Code section 654].)

Here, trial counsel failed to object to the trial court's mistaken use of the minimum statutory fine that was in effect at sentencing to calculate appellant's restitution fund fine. We cannot conceive of any tactical reason for counsel's failure to object.  On the record before us, given the court's commitment to use the statutory formula in Penal Code section 1202.4, subdivision (b)(2), it appears more than likely that the court would have imposed the restitution fine using the $200 minimum that was in effect when appellant committed his crimes had counsel raised an objection at the sentencing hearing. Accordingly, we conclude that trial counsel's performance was deficient.

As a result, we will use the statutory formula to reduce the restitution fund fine to $8,800—$200 multiplied by 11 (the number of years of imprisonment) multiplied by 4 (the number of felony counts).  Since the parole revocation fine the court imposed must be the same amount as the restitution fund fine, we will order that the parole revocation fine be set at $8,800.  (Pen. Code, § 1202.45 [in every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Penal Code section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed

25

pursuant to subdivision (b) of Penal Code section 1202.4].)[14]

*Disposition*

The judgment is modified to reflect the imposition of a restitution fund fine in the amount of $8,800 and a parole revocation fine in the same amount.[15] As so modified, the judgment is affirmed.

---

[14] We note for the record that the court had no statutory authority to impose a restitution fund fine exceeding $10,000.

[15] The parole revocation fine is suspended unless appellant's parole is revoked.

_____

ELIA, J.

WE CONCUR:



_____

RUSHING, P. J.



_____

PREMO, J.



*People v. Martinez*

H039398

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Hon. Julie R. Culver |
| Attorney for Appellant: | Patrick McKenna,<br>Under Appointment by the<br>Court of Appeal |
| Attorneys for Respondent: | Kamala D. Harris,<br>Attorney General,<br>Dane R. Gillette,<br>Chief Assistant Attorney General,<br>Gerald A. Engler,<br>Sr. Assistant Attorney General,<br>Rene A. Chacon and<br>Julia Y. Je,<br>Deputy Attorneys General |

*People v. Martinez*

H039398