Filed 1/12/16  P. v. Zhdamirov CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>VIKTOR ZHDAMIROV,<br><br>      Defendant and Appellant. | C076623<br><br>(Super. Ct. No. CRF123914) |

       This is a case about honeybees, theft, and restitution.  A substantial number of beehives were stolen from two fields used by Mark Tauzer, a commercial beekeeper.  Tauzer and his son Trevor, who assisted with his father's beekeeping business, followed a path of bees to a field owned by defendant Viktor Zhdamirov, who was found in

1

possession of a large number of hives stolen from the Tauzers' apiary.[1]  Defendant was

charged with grand theft (Pen. Code, § 484, subd. (a))[2] and receiving stolen property

(§ 496, subd. (a)).  A jury acquitted him of grand theft but convicted him of the felony

receiving stolen property.  The trial court suspended imposition of sentence and placed

defendant on three years' formal probation subject to various conditions, including the

payment of $32,450 in victim restitution for the total loss of the hives found in

defendant's possession.

On appeal, defendant claims the restitution award was an abuse of discretion

because it did not take into account annual depreciation to the hives or the value of the

hives recovered from defendant.  He also claims the imposition of a $300 restitution fine

violated the state and federal prohibitions against ex post facto punishment.  We conclude

the trial court did not abuse its discretion.  Finding no ex post facto problem with the

restitution fine, we affirm the judgment.

BACKGROUND

*The Trial*

Mark Tauzer has been a commercial beekeeper in Yolo County since 1973.  His

son Trevor assisted him.  The Tauzers leased their bees to farmers for crop pollination.

In 2012, the Tauzers had 76 hives off of Jefferson Boulevard between Clarksburg

and West Sacramento.[3]  They had 340 hives in another location, "on Z line in

Clarksburg."  The hives were all marked with the Tauzers' name and phone number.

---

[1]    As both Tauzers testified, we refer to them by their individual names where appropriate.  An apiary (also known as a bee yard) is a place where beehives of honey bees are kept.

[2]    Undesignated statutory references are to the Penal Code.

[3]    A hive consists of two boxes, each containing 10 frames of bees, with one queen to each hive.

They were worth more than $125,000, not counting considerable annual income from their rental.

On September 12, 2012, the Tauzers learned that some of the hives were missing. Mark sent his son Trevor and an employee to the Z line yard. The yard looked like a bear had gone through it; some hives were knocked over or missing and others were open and exposed. Parts of about 20 hives were taken from the yard. Many of the remaining hives were compromised; tops were left off several of the boxes that contained individual hives, causing bees coming from the outside to take a hive's honey and thereby exposing the hive's bees to viruses. This "robbing" behavior by invading bees killed a number of bees in the remaining hives at this location.

The Jefferson field was "just a mess." Thirty-two of the 76 hives were gone and everything else was ruined. The Jefferson hives were worth $300 each and, in February, would have rented for $150 apiece for pollination. Based on the condition of the hives and the absence of a queen, Mark estimated the theft took place about five to eight days before it was discovered.

Mark reported the theft to the police. Shortly thereafter, he found 30 lids from his hive boxes and an empty five-gallon bucket of green paint on Jefferson Boulevard about a quarter mile from the Jefferson yard. By following a route of bees,[4] Mark and Trevor found their hives at an apiary on top of a levee, about a quarter mile from the Z line and two to three miles from the Jefferson yard. The hives were painted green and their brand[5] had been puttied over. Someone had placed lids on the boxes that were from an Eastern European style of beekeeping. The green paint on the hives matched the paint in

---

[4]     A bee can fly approximately two miles. Bees removed from their hive and relocated into another hive within two miles will return to the old hive.

[5]     A series of numbers burned onto the side of the hive's wooden frame.

the bucket found along Jefferson Boulevard. At the location, Trevor detected a very strong odor of American Foulbrood, a disease lethal to bees.

Amy Del Bondio, an inspector with the Yolo County Department of Agriculture, met the Tauzers at the place where they found their hives, helping them document the hives as they were opened. Upon opening some of the hives, the Tauzers found their names and their brand, which had been registered with the county. Mark saw that his boxes had been mixed with the other hives. The Tauzers eventually recovered 80 boxes, but three had to be destroyed due to disease. From these, they were able to recover 33 hives. All the hives stolen as well as those left behind at the Jefferson yard had to be destroyed. Trevor was convinced that the disruption caused by thefts led to attrition of the hives greater than the normal 12 percent every winter.

On September 15, 2012, Yolo County Sheriff's Deputy Donald Harmon went to the levee apiary, where he found defendant working on the remaining hives. After an initial interview, Deputy Harmon arrested defendant and took him to jail, where an interpreter was available for defendant, who spoke only Russian. Defendant gave a *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] waiver and said that the bees belonged to him. After being told that 80 stolen hives had been recovered by their owner, defendant said he took the nearby hives two weeks ago after another person's bees were placed near his, causing the two sets of bees to mix. Defendant said he took the bees to recover his losses from the mixing.

Defendant testified on his own behalf. He was from Russia and had lived in the United States for about 15 years at the time of the trial. In Russia, he worked in a factory and as a beekeeper.

In September 2012, he worked as a concrete finisher and had his own beekeeping business. In August 2012, a Russian-speaking person approached him at church and offered to sell him 50 beehives for $50 apiece. At the time, he thought the hives were worth no more than $120 each. He did not know the hives were stolen and would not

4

have bought them had he known. Defendant put putty on the boxes and painted them in order to fix them. The paint bucket found by the road was his. Later, after defendant set up the hives, the man who sold them came to him and asked for money. The man told defendant the boxes were stolen and that if defendant told anyone there would be trouble for him and his family. Defendant then returned to the field and found that the boxes were gone.

*Restitution*

Following the verdict, the People filed a request for $65,000 in victim restitution for damages to the Tauzers' beekeeping business. In support of the request, the People noted the damage to the hives from robbing by invading bees, disease damage from the mixing of defendant's and the Tauzers' hives, loss of contracts and production, and damage to the boxes. The People derived the $65,000 amount from Tauzers' testimony, which already factored in the 12 percent annual attrition on the hives.

The probation report included a letter from the Tauzers detailing their losses stemming from the theft and defendant's treatment of their hives. The losses incurred were $40,560 for 240 damaged hives and $25,350 in lost pollination fees, for a total of $65,910. The letter noted that a total of 416 hives were affected by the theft, and 80 hives were stolen, "with severe damage caused by robbing of the remaining bees." The letter additionally stated: "Of those 80 hives only 33 survived to almond pollination meaning 47 hives died. This is a 12% hive loss. The average loss of hives to pollination is 5.64% meaning we lost 42 hives strictly from the damage caused by [defendant]." According to the Tauzers, this constituted $6,300 in lost pollination fees and $10,800 from damages.

Continuing, the letter stated that in the "next yard" they expected 299 of the 340 hives to survive to almond pollination. The actual survival rate was 172, meaning 127 were lost due to theft or vandalism. This amounted to $19,050 in lost pollination fees and $30,480 in damage to the hives.

5

Defendant presented no evidence at the combined sentencing and restitution hearing, but argued that he was responsible for only the diminution of value that occurred while he possessed the hives and what harm he may have contributed to those hives. Defendant also claimed he tried to increase the value of the hives while he had them and could not be responsible for the time they were not returned because the jury did not convict defendant of theft.

The trial court noted that it was dealing with the compromised integrity of the hives that were recovered in defendant's possession. It would be wrong to just deal with the hives lost by the Tauzers, as the surviving hives were contaminated and had a much higher mortality rate. The court found that "the fact that the hives in the defendant's possession were not located in close proximity to the other hives that remained at the two locations where the Tauzers kept their bees clearly affected the overall health of what I'll call the community." While the court "could not conclude that the defendant is responsible for losses related to the theft of all the hives," it found that for the 80 hives recovered from defendant's property, they were so compromised that there was no way to calculate a reduction in value to them, so it awarded $300 per hive in restitution for them. Since the Tauzers' letter sought $25,350 in pollination fees for all 240 hives, the pollination fee was "$104 or $105 per hive." Multiplying that figure by the 80 hives generated another $8,450 in restitution for lost pollination fees. Together, the two totaled $32,450, which the court set as the restitution order.

DISCUSSION

I

Defendant contends the trial court's restitution order was an abuse of discretion. He claims the award was not supported by the evidence because it did not take into account the 33 hives the Tauzers were able to recover from the 80 stolen hives found on defendant's property. Defendant additionally notes trial testimony that the Tauzers typically lost 12 percent of their hives each winter. According to defendant, the Tauzers

6

would therefore lose nine or 10 of the 80 hives during the winter, for a net loss of 37 to 38 hives. Using this revised loss figure, defendant concludes that the Tauzers were entitled to no more than $11,100 to $11,400 for the lost hives and $3,885 to $3,990 for the lost pollination fees, for a total restitution amount of $14,985 to $15,390. The court's restitution order, he concludes, is a "windfall" to the victims and therefore an abuse of discretion. He asks us to reduce the restitution award or to remand for a new restitution hearing.

"Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).) The court " 'must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious.' [Citations.]" (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498.)

"The sentencing court has broad discretion to determine whether an eligible defendant is suitable for probation and, if so, under what conditions" (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 (*Carbajal*)), including "conditions to foster rehabilitation and to protect public safety pursuant to . . . section 1203.1. [Citations.]" (*Carbajal, supra,* at p. 1120.) Section 1203.1, subdivision (b) requires the court to consider whether defendant should make restitution to the victim; and subdivision (j) states: "The court may impose and require . . . [such] reasonable conditions[] as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer . . . ." A sentencing court's broad discretion to impose reasonable conditions of probation "includes ordering restitution, if such a condition is reasonably related to the crime of which the defendant was convicted or to future criminality. [Citations.]" (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1209.)

We review restitution orders for abuse of discretion, and we will not reverse unless the order is arbitrary or capricious. (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045.) No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered. " '[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.]' [Citation.]" (*Ibid.*) No particular kind of proof is required to support a restitution order. (§ 1202.4.) Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim. (*People v. Fulton* (2003) 109 Cal.App.4th 876, 886.)

The Tauzers submitted a claim for restitution of $65,910. This amount was based on losses to their beekeeping business caused by damages to their remaining hives as well as losses incurred as a result of defendant possessing the stolen hives. The trial court began its analysis by announcing it was dealing with the compromised integrity of the Tauzers' hives found in defendant's possession. The court said it "would not conclude that the defendant is responsible for the losses related to the thefts of all the hives." Focusing on the stolen hives in defendant's possession, the court found that it would award restitution as if all 80 hives were destroyed.

Although the trial court did not provide further explanation, it appears the restitution determination flowed from the fact that defendant was acquitted of the theft count. Defendant argued to the court that he was responsible for only the damages caused to the hives in his possession. The trial court implicitly agreed with this argument. The only apparent reason for distinguishing between damages to those hives in defendant's possession and the damage to the remaining hives resulting from the theft was that defendant was acquitted of the theft count and convicted of possession of stolen property.

8

Another example of the trial court's reasoning is found in the restitution for lost pollination fees. The Tauzers sought restitution for lost pollination fees for all hives lost or damaged in the theft, but the trial court limited restitution for lost pollination related to those hives in defendant's possession. The trial court used the Tauzers' statement of the lost pollination fees per hive to calculate the lost pollination fees in its restitution order. The reason appears to be the trial court's conclusion that restitution should not be ordered for losses attributable to the theft because of defendant's acquittal on the theft charge.

The trial court did not abuse its discretion. When a defendant is sentenced to state prison, a trial court generally cannot order restitution related to a crime for which the defendant was acquitted. (*People v. Percelle* (2005) 126 Cal.App.4th 164, 180.) But when the defendant's sentence contains a grant of probation, as it does here, the trial court may order restitution related to a charge for which defendant is acquitted so long as the restitution is reasonably related to defendant's crime or future criminality. (*Carbajal, supra,* 10 Cal.4th at p. 1123.) The trial court is not required to do so, and the decision is a matter of discretion. Here, the trial court's order was not arbitrary or capricious.

II

Defendant contends the trial court violated the state and federal prohibitions against ex post facto punishment by imposing a $300 restitution fine. (§ 1202.4, subd. (b)(1).)

Section 1202.4, subdivision (b)(1) provides in relevant part that every defendant is subject to a separate and additional restitution fine, at the discretion of the trial court. At the time of defendant's offense, the permissible range of the fine was $240 to $10,000. (Stats. 2011, ch. 358, § 1.) Although the minimum fine had been increased to $300 by the time of defendant's sentencing, defendant was still eligible for the earlier minimum fine of $240 based on the date of his offense. (*Ibid.*)

At sentencing, the trial court did not expressly indicate an intent to impose the minimum restitution fine, and no objection was made to the $300 amount. Defendant

9

points out that the court ordered him to pay as little as $50 a month towards the fines, fees, and restitution. From this, he concludes that the trial court intended to impose the minimum fine, and imposing the higher minimum fine based on a change in the law after he committed the offense constituted an impermissible ex post facto punishment.

"[A] defendant's failure to object in the trial court to the imposition of a restitution fine constitutes a waiver of the right to complain thereof on appeal." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1469 (*Gibson*).) The forfeiture rule applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353.)

In *Gibson* we considered the appeal of a restitution fine the defendant claimed he did not have the ability to pay. (*Gibson, supra*, 27 Cal.App.4th at p. 1467.) In that case, we stated that "the need for orderly and efficient administration of the law -- i.e., considerations of judicial economy -- demand that defendant's failure to object in the trial court to imposition of the restitution fine should preclude him from contesting the fine on appeal. [Citations.]" (*Id.* at p. 1469.) The same considerations apply in this case to defendant's arguments that the trial court failed to appreciate the full scope of its discretion and that the court violated ex post facto principles. By failing to object on these grounds in the trial court, defendant forfeited his right to object and cannot raise the ex post facto claim. (*People v. Martinez* (2014) 226 Cal.App.4th 1169, 1189.)

Defendant's claim also fails on the merits. The trial court did not state an intent to impose the minimum fine. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. . . .' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, original italics.) Allowing defendant to pay as little as $50 a month towards all fines, fees, and restitution may indicate sympathy for the limited means of defendant, who had nine children and worked as a concrete finisher, but it does not show an intent to impose the minimum fine.

DISPOSITION

The judgment is affirmed.


     NICHOLSON    , Acting P. J.


We concur:


     MAURO     , J.


     RENNER     , J.