Filed 6/25/21  P. v. Ruizpaz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS RUIZPAZ et al.,<br><br>    Defendants and Appellants. | H044593<br>(Santa Clara County<br>Super. Ct. No. C1076422) |

On April 21, 2010, Jose Calderon was stabbed and shot to death while he waited at a bus stop with a friend in an area that was generally considered to be Norteño gang territory.  The murder was committed by two Sureño gang members, defendants Carlos Ruizpaz[1] and Jose Jesus Torres, who assaulted Calderon at random as an act of retaliation against the Norteños.  After a jury trial, defendants were each convicted of first degree murder (Pen. Code, § 187)[2] with a gang enhancement (§ 186.22, subd. (b)(1)(C)), a gang special circumstance (§ 190.2, subd. (a)(22)), and a firearm enhancement (§ 12022.53, subd. (d)).  The jury also found true an allegation that Torres personally used a deadly weapon (§ 12022, subd. (b)(1)).  Both defendants were sentenced to a total term in prison of life without the possibility of parole consecutive to 25 years to life.

---

[1] Throughout the proceedings in the trial court, Ruizpaz's last name was sometimes referred to "Paz" or "Ruiz Paz."  Documents like the charging information and the abstract of judgment, however, use the name "Ruizpaz."  For consistency, we will also use the name Ruizpaz.

[2] Unspecified statutory references are to the Penal Code.

On appeal, Ruizpaz argues that the trial court abused its discretion by admitting evidence of his prior juvenile adjudication for carrying a loaded firearm in public. Both defendants argue that: (1) this court should independently review the sealed transcript of an ex parte hearing held after the jury reached its verdict to determine if there was evidence that should have been disclosed to the defense; (2) remand is required so that the trial court can determine whether to exercise its newfound discretion to strike the firearm enhancements; (3) the gang enhancements that were stayed should be stricken; (4) the restitution fines should be reduced to the statutory minimum of $200; and (5) the trial court should be permitted to reconsider the imposition of fines and fees that were imposed without determining defendants' ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We reverse and remand the matter for the limited purpose to permit the trial court to consider whether to exercise its discretion to strike defendants' firearm enhancements. As to both defendants, we further direct the trial court to reduce the restitution fines to the statutory minimum of $200 and to strike the gang enhancements.

## BACKGROUND

### 1. *The Information*

On August 4, 2016, an information was filed charging defendants with murder (§ 187). As to each defendant, the information alleged a firearm enhancement (§ 12022.53, subds. (d), (e)(1)), a gang enhancement (§ 186.22, subd. (b)(1)(C)), and a gang special circumstance (§ 190.2, subd. (a)(22)). The information also alleged that Torres personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)).

2. ***The Trial***

  a. ***The Prosecution Case***

  i.  ***The Assault on Gary Garcia and the Planned Retaliation***

On April 20, 2010, Gary Garcia was the victim of an assault and suffered multiple lacerations.[3]  Garcia was a member of the Varrio Sureno Town (VST)[4] subset of the Sureño criminal street gang.

The next day, A.O., Torres, Torres's brother, and Garcia formulated a plan to retaliate against the Norteños, who they believed had "jumped" Garcia.  Torres believed that Garcia may have been assaulted by someone who was in the West Side Mob or Horseshoe Norteño gang.  The men intended to attack "anybody that would be out" that could be gang affiliated.  A.O. called Ruizpaz and asked him if he was "down to go Buster" hunting, and Ruizpaz answered yes.[5]

At the time, A.O. was 17 years old and was a member of the Varrio Tami Lee Gangsters (VTG) Sureño subset and went by the gang moniker "Creeper."[6]  Torres was a

---

[3] San Jose Police Department Officer Jonathan Koenig identified Garcia as Gary Garcia Esquivel.  The other witnesses at trial, however, referred to Garcia as "Gary Garcia."

[4] A.O. testified that Garcia belonged to the "Varrio Sureno Malditos" or "VSM" Sureño subset.  A.O. also testified that VSM was divided into "two sets," the east and the west, and Torres had a tattoo that said "West Side Malditos" that meant he was from "the west side set of VSM."  Officer Jesse Ashe, the prosecution's gang expert, identified that Torres belonged to the "Varrio Sureno Town, VST Malos" gang.  Torres himself self-identified as a member of "VST."  The evidence thus reflects that VSM and VST refer to the same Sureño subset, and we will refer to Garcia as belonging to the VST subset out of clarity.

[5] "Buster" is a disrespectful term used to describe Norteños.

[6] A.O. testified for the prosecution after negotiating a plea agreement with the district attorney's office.  A.O. had initially been charged with Calderon's murder and a gang enhancement, but he pleaded to voluntary manslaughter with the understanding that he would face between six to 21 years in prison.  The plea agreement specified that there was no agreement as to the length of A.O.'s sentence, and A.O.'s sentencing was to be (continued)

3

member of VST and went by the moniker "Stomper" or "Chewy." Ruizpaz was a VTG member and went by the moniker "Boxer."

A.O. drove his mother's car, picked Ruizpaz up, then drove Torres and Ruizpaz around as they looked for potential targets. An SUV carrying Torres's brother followed A.O.'s car. A.O. recalled that he saw that Torres had a pocket knife. He did not recall seeing Ruizpaz with any weapons. At one point, A.O. drove past a man riding a bicycle. A.O. asked the bicyclist if he was a gang member, and the bicyclist said no. A.O. left it at that and "kept on pushing" to find a target.

ii. ***Calderon's Murder***

At some point after A.O. passed the bicyclist, Torres alerted A.O. of a potential target and told A.O. to make a U-turn near a bus stop. The potential target identified by Torres was at the bus stop with a girl. Torres and Ruizpaz got out of A.O.'s car and walked toward the bus stop. A.O. thought that the men were going to go over and "beat up that guy."

At the bus stop, which was near Willard Avenue and West San Carlos Street, was 15-year-old T.C. and her friend, 22-year-old Jose Calderon. Earlier that day, T.C. and Calderon had watched a movie and had spent some time together at T.C.'s nearby apartment. T.C. and Calderon were standing at the bus stop when T.C. noticed "[t]wo Hispanic males dressed in all black, early 20s" walk off Willard Avenue and turn toward them. As the men passed by, they looked at Calderon and asked him, " 'What's up, homey?' " Calderon did not respond. At the time, Calderon was wearing a black and red hat. T.C. did not know if Calderon was in a gang.

---

continued until after he testified at trial. During trial, A.O. testified about some of his criminal history and stated that around the time of the murder, he had been recently released from the "Ranch," where he had spent eight months for a juvenile adjudication for grand theft of an automobile.

4

T.C. watched the men as they walked away. Calderon had his back toward them. Suddenly, the men turned around started to run toward T.C. and Calderon. T.C. tried to push Calderon out of the way, and he stumbled onto the street. One man kept Calderon in position while the other man hit him on his back. T.C. heard Calderon say, " 'You're stabbing me.' " She heard one of the men who was assaulting Calderon yell, " 'Sur.' " Calderon stumbled backward and fell onto the ground. The man who had been keeping Calderon in position pulled out a semi-automatic gun and fired five shots at Calderon. T.C. turned around and saw a car come down Willard Avenue. The two men got into the car, and the car drove away. T.C. called 911 at 9:32 p.m. that evening.[7]

A.O. had stayed in the car during the assault, and he saw Torres and Ruizpaz approach the man at the bus stop. A.O. saw that Torres and Ruizpaz talked to the man then started throwing punches to the man's back and to his side. The man stumbled to the ground, and Torres ran back to A.O.'s car with a knife in his hand. Torres had a cut on his hand between his finger and thumb. A.O. saw Ruizpaz stand in front of the man and shoot him approximately three times with a gun. After Ruizpaz shot the man, he ran back to A.O.'s car. Torres got into the front passenger seat, and Ruizpaz got into the backseat. Because of his wound, Torres left blood on the seatbelt and seat of A.O.'s car.

### iii. *The Aftermath of the Murder*

After Torres and Ruizpaz got back into the car, A.O. drove to a shopping center. The SUV that had been following A.O.'s car pulled up next to them, and A.O. told Torres and Ruizpaz to get out of his car and into the SUV. Torres and Ruizpaz got into the SUV, and A.O. followed the SUV to S.Z.'s house. S.Z. had friends who were Sureños, but she did not consider herself to be a member of the gang.[8] A.O. parked the car in a

---

[7] A recording of the 911 call was admitted into evidence.

[8] S.Z. testified for the prosecution under a grant of immunity.

5

nearby alley, and Torres stepped out of the SUV and called S.Z. After Torres got out of the SUV, the SUV drove away.

A.O. recalled that S.Z. took the men into her house and into her room, and S.Z. took Torres to clean the wound on his hand. At some point, while Torres and A.O. were in S.Z.'s room, Torres told A.O. that he thought that the girl at the bus stop might have recognized him. A.O. replied, " 'You better hope she don't tell.' " Torres said, " 'We fucked up.' " S.Z. recalled that she overheard Torres and A.O. talking. She heard one of them say something about "messing up," and she heard Torres mention that he thought "the girl" had recognized him.

A.O. and Torres did not tell S.Z. about what had happened. A.O. asked S.Z. to help put his car inside her backyard, but S.Z.'s mother did not let S.Z. have the key to the backyard. S.Z. recalled that at one point, A.O. insinuated that the police were looking for his car. A.O. saw Torres take out a gun and put it in a shoebox in S.Z.'s closet. A.O. recalled that S.Z. was present at the time.[9] A.O. assumed that it was the same gun that Ruizpaz had used earlier during the murder. One of S.Z.'s friends drove over, picked up Torres and A.O., and dropped A.O. off at his house.

The following morning, A.O. called S.Z. and asked her to bring his car over to his house. S.Z. drove A.O.'s car to return it to him. Approximately a minute after S.Z. left her house, she was pulled over by the police and taken to the police station. After S.Z. returned home, she deleted some items from her phone and changed Torres's name in her contact list to "Gary." During her interviews with the police, S.Z. feared for her safety because the people involved in the case were gang members.

---

[9] A.O. disclosed that Torres had hid a gun in S.Z.'s closet for the first time during defendants' trial. A.O. explained that he never disclosed this information in his prior interviews because he did not want to get S.Z. in trouble.

After A.O. was arrested, he was housed with Torres and discussed the case with him. Torres told A.O. that he had gotten rid of the gun, but he did not specify how. Torres also told A.O., " 'Don't got shit on us.' " Later, A.O. dropped out of the gang and went into protective custody.

E.M., a VTG gang member, was arrested in 2012 on unrelated charges.[10] Several years before E.M. was arrested, Ruizpaz called E.M. and said that he had shot a Northerner twice in the head. After speaking with Ruizpaz over the phone, E.M. met with Ruizpaz in person. During their meeting, Ruizpaz said that Torres had stabbed the Northerner.

Shortly after Calderon's murder, T.C. told officers that she thought that she could identify the two men who had assaulted Calderon. T.C. was shown multiple photo lineups and went to jail to see inmates in person, but she was never able to identify the perpetrators.

iv.    ***Forensic Evidence***

A forensic pathologist testified that Calderon had been inflicted with three gunshot wounds and 13 stab wounds. One of the gunshot wounds and two of the stab wounds would have been "quickly fatal." The other injuries would have been "survivable to potentially survivable."

An expert in communications detail record analysis testified that on April 21, 2010, at around 11:00 p.m., a call was made between A.O.'s and S.Z.'s phones. A.O. and S.Z. called each other at around 6:27 a.m. the next morning. There were records that showed that on April 21 and 22, 2010, calls were made between A.O., Ruizpaz, and Torres. On April 21, 2010, Ruizpaz's phone pinged a cell tower near Garcia's house at

---

[10] E.M. testified on behalf of the prosecution after negotiating a plea agreement with the district attorney's office. E.M. was not involved in Calderon's murder. E.M.'s 2012 arrest was for an unrelated crime of attempted murder.

around 8:07 p.m., and at around 9:00 p.m., his phone traveled from the west side of San Jose to the east side, past the crime scene area toward S.Z.'s house.

A.O.'s DNA was found on the steering wheel of his car, and Torres's DNA was found on the front right passenger door handle. Torres's blood was also found on the car's front passenger seatbelt and seat.

A firearm analysis expert testified that a bullet that was found after an officer opened the door to A.O.'s car was "struck by the same firing pin" that fired three spent cartridges that were found at the scene of Calderon's murder. Officers recovered three .25-caliber casings, a .25-caliber cartridge, and a copper-jacketed bullet at the scene of the murder.

Torres was arrested on May 5, 2010, and, at the time of his arrest, he had a cut between his thumb and forefinger.

v. *Gang Evidence*

Sunnyvale Public Safety Officer Jesse Ashe was designated as an expert in criminal street gangs. Officer Ashe explained that a Sureño is a street soldier for the Mexican Mafia prison gang. The Mexican Mafia consists mostly of Hispanic males within the prison system. Underneath the Sureño umbrella are various subsets. It is not unusual for different Sureño subsets to commit crimes together.[11] Sureños identify with the number 3 and 13, the color blue, and the letter M. The gang's primary activities include property offenses, weapon offenses, vehicle theft, drug sales, possession of loaded and concealed firearms, assaults with a deadly weapon, attempted murders, murders, carjacking, robbery, and kidnapping. Officer Ashe opined that beating an unarmed man in public furthered the gang's objectives by increasing the gang's power

---

[11] A.O. testified that it was common for Sureño members from different subsets to commit crimes together "[b]ecause they're all Surenos."

and placing fear in the community. Officer Ashe further opined that Ruizpaz was a VTG member and Torres was Varrio Sureno Town or VST Malos gang member.[12]

According to Officer Ashe, retaliation is important to the Sureño gang. Gang members view each other as brothers and sisters and want to protect each other. Gang members feel it is their responsibility to retaliate if one of their own is attacked. Gang members also feel that an attack against their own leaves members feeling disrespected, and gang members do not want others, including rival gangs and rival gang members, to perceive them as weak. Officer Ashe believed that a Sureño gang member who takes retaliatory action against someone who is wearing red clothing in a predominantly Norteño neighborhood commits the crime for the benefit of the Sureño gang.

According to Officer Ashe, firearms "are of extreme significance" to Sureños. A Sureño who carries a gun tends to be someone "who's more down with the gang, someone who's willing to commit more violent acts; and, in turn, gets respect, more respect and more power within their gang." Firearms tend to be "passed around" to other gang members after they are used.

Gang members that testify against other gang members may be subject to removal from the gang and be considered "bad news," which means that an active Sureño gang member would be expected to react violently toward that individual if they encounter him or her on the street.

The primary rivals to the Sureños are the Norteños. The Norteños are the street soldiers for the Nuestra Familia prison gang. Norteños identify with the color red, the San Jose Sharks symbol, the numbers 14 and 4, and the letter N. Officer Ashe opined that the area where Calderon was murdered was predominantly perceived by law enforcement as a Norteño gang area controlled by the West Side Mob subset.

_____

[12] A.O. testified that in April 2010, there were more than 30 VTG members, and the members had meetings every two weeks to a month.

Officer Ashe also opined that the red and black baseball cap worn by Calderon when he was murdered was common among Norteño gang members because of the red bill cap and the "SJ" symbol.

vi.    *Defendants' Prior Police Contacts and Juvenile Adjudications*

On January 14, 2008, officers stopped Torres while he was driving a stolen car. Torres indicated that he had an ice pick in his front pocket and identified himself as a VST member.

On October 31, 2008, officers responded to reports of trespassing at Fair Middle School, which was in VTG gang territory. Ruizpaz was seen jumping over a fence. As Ruizpaz jumped over the fence, something fell out of his pocket. Officers later recovered the object, which was a loaded .357-caliber revolver. Approximately five to seven other individuals were fleeing from the police at the time.

While Ruizpaz was in juvenile hall in 2009, he admitted to having scratched some graffiti in his cell, including graffiti that said "Boxer VTG."

On April 10, 2010, officers stopped a car near downtown San Jose. Torres was one of the occupants inside the car, and the car contained multiple items that could be used as weapons including knives, tools, and a hammer.

The parties stipulated that Ruizpaz was charged with committing a felony violation of former section 12031, subdivision (a)(1) (carrying a loaded firearm in public) on or about October 31, 2008, and Ruizpaz admitted to committing the offense and the violation was found true by the juvenile court on December 23, 2008.[13] The parties also

---

[13] The reporter's transcript reflects that the parties stipulated that Ruizpaz was charged with violating "Penal Code Section 2031, subdivision (a)(1)." This appears to be a clerical error. Former section 12031, subdivision (a)(1) is the statute that used to criminalize carrying a loaded firearm in public. Former section 12031 was carried over without substantive change to section 25850. (*People v. Wade* (2016) 63 Cal.4th 137, 140.)

stipulated that Ruizpaz was charged with committing a felony violation of section 594, subdivisions (a), (b)(1) (vandalism), on or about December 28, 2009 and February 28, 2009, and Ruizpaz admitted to committing the offense and the offense was found true by the juvenile court on March 27, 2009.

The parties stipulated that Torres was charged with committing a felony violation of Vehicle Code section 10851, subdivision (a) (unauthorized use of a vehicle) and a misdemeanor violation of former section 12020, subdivision (a)(1) (repealed 2012) (possession of an ice pick), on or about January 14, 2008, and Torres admitted to committing the offenses and the juvenile court found the offenses to be true on February 1, 2008.

b. *The Defense Case*

i. *Torres's Alibi*

Torres's ex-sister-in-law testified that on April 21, 2010, Torres and his brother played video games and were at her apartment from 7:00 p.m. until she went to sleep. Torres's ex-sister-in-law usually went to sleep at around 11:00 p.m. or midnight.

ii. *Alternative Explanation for Blood in A.O.'s Car*

Torres's wife recalled that she went to a birthday party with Torres shortly before he was arrested for Calderon's murder. A lot of Sureños went to the party, and the police were eventually called. After the police left, there was an altercation with some Norteños, and Torres was hit with a bottle to his face and started bleeding.[14] Afterwards, Torres got into the front seat of A.O.'s car.

---

[14] Earlier, A.O. testified that he went to a party with S.Z. and Torres in the weeks leading up to the shooting. He did not remember any fights, and he drove himself home afterward. S.Z. testified that she recalled going to a party, and she remembered that there was a fight and Torres ended up bleeding.

11

### iii.  *S.Z.'s Denial that She Hid a Gun*

S.Z. was recalled by the defense, and she denied that anyone ever left a gun in her house, or that Torres ever helped her hide a gun inside her closet.

### iv.  *Forensic Evidence*

A consultant in cell phones, cell phone location, and call detail analysis testified that Ruizpaz's phone was moving on highway 17 onto Interstate 280 and then highway 87 around the time of the murder.

According to an expert in latent print examination, Ruizpaz's fingerprints did not match any of the latent prints found in A.O.'s car.  However, A.O.'s and Garcia's prints were found inside the car.

## 3.  *The Verdict and Sentencing*

On December 19, 2016, the jury found both defendants guilty of murder and found the charged enhancements and special circumstances to be true.

On March 17, 2017, the trial court sentenced Ruizpaz to life without the possibility of parole for his conviction of murder (§ 187), consecutive to 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).  The trial court imposed and stayed a 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)).

That same day, the trial court sentenced Torres to life without the possibility of parole for his conviction of murder (§ 187), consecutive to 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).  The trial court imposed and stayed a one-year enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)) and a 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)).

### DISCUSSION

## 1.  *Ruizpaz's Prior Juvenile Adjudication for Carrying a Loaded Firearm*

Ruizpaz argues that the trial court erred when it admitted his prior juvenile adjudication for carrying a loaded firearm in public as evidence of a predicate offense to show a pattern of criminal gang activity (§ 186.22, subd. (e)) and evidence of motive to

12

commit the charged offense (Evid. Code, § 1101, subd. (b)).  Ruizpaz argues that the evidence should have been excluded under Evidence Code section 352 because its probative value was substantially outweighed by its potential for prejudice.

a. ***Background***

On October 3, 2016, Ruizpaz filed a motion in limine seeking to exclude all references to his prior juvenile adjudications.  On October 4, 2016, the trial court held a hearing and considered whether evidence of Ruizpaz's prior juvenile adjudications and convictions should be admitted.  During the hearing, the People acknowledged that Ruizpaz had a prior domestic violence case involving a criminal threat (§ 422), which the People intended to use as impeachment if Ruizpaz testified at trial.  The People also argued that Ruizpaz had multiple juvenile adjudications, including a 2008 adjudication for possession of a loaded firearm that involved other gang members, another 2008 adjudication for possessing two concealed dirks and daggers that involved other gang members, and a 2009 adjudication for felony vandalism where Ruizpaz inscribed his gang moniker in his juvenile hall cell.  The People intended to introduce these offenses as predicate offenses to prove the gang enhancement alleged in the case.  After considering the parties' arguments, the trial court excluded the domestic violence case as more prejudicial than probative under Evidence Code section 352.  The trial court reserved ruling on the admissibility of Ruizpaz's juvenile adjudications.

On October 6, 2016, the People filed a motion summarizing the gang evidence to be introduced at trial, which included Ruizpaz's 2008 juvenile adjudication for carrying a loaded firearm in public.  The People argued that Ruizpaz's 2008 juvenile adjudication would be used to prove a predicate offense under section 186.22, subdivision (e)(33) and Ruizpaz's gang membership.  That same day, the trial court held a hearing and decided to permit the prosecution to present its intended evidence of predicate offenses, including Ruizpaz's 2008 juvenile adjudication.

13

On October 27, 2016, Ruizpaz asked the trial court to reconsider its ruling on his 2008 juvenile adjudication. Ruizpaz argued that the nature of the offense, carrying a loaded firearm in public, was "too closely aligned to the allegation in this case that the jury has to decide." Ruizpaz insisted that the jury would use the evidence to establish his identity as the shooter in Calderon's murder. Thus, Ruizpaz claimed that the juvenile adjudication would be more prejudicial than probative under Evidence Code section 352. The People argued that the evidence was relevant to prove a necessary predicate offense for the gang enhancement charged in the case and would be used by the gang expert to opine that Ruizpaz was a Sureño when Calderon was murdered.

The trial court determined that the 2008 juvenile adjudication was admissible under Evidence Code section 352. The trial court stated: "[T]he probative value . . . doesn't just go to whether or not [Ruizpaz] is in a gang; but according to [the prosecutor], there will be testimony about further commitment to the gang as illustrated by the possession of the firearm. The fact that the firearm is not the same caliber as the one used in this particular case also, in this Court's opinion, makes a difference in terms of its prejudicial effect. And, for those reasons, the Court is going to choose to allow it to be admitted if the People so choose."

After the close of evidence, the jury was instructed with CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements and special circumstance allegations charged; [¶] OR [¶] The defendant had a motive to commit the crime charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

14

b. *General Legal Principles and Standard of Review*

In general, "all relevant evidence is admissible." (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Relevant evidence must be excluded "when its probative value is *substantially* outweighed by its prejudicial effect." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*); Evid. Code, § 352.) " 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*Tran*, *supra*, at p. 1047.)

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on a different ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

c. *Analysis*

Ruizpaz argues that the trial court abused its discretion under Evidence Code section 352 when it admitted evidence of his 2008 juvenile adjudication for carrying a loaded firearm in public to show a pattern of criminal gang activity under section 186.22, subdivision (e) and to prove motive under Evidence Code section 1101, subdivision (b).

In *Tran*, the California Supreme Court held that for the purposes of section 186.22, a predicate offense can be established "by proof of an offense the defendant committed on a separate occasion." (*Tran*, *supra*, 51 Cal.4th at p. 1046.) Thus, Ruizpaz's 2008 juvenile adjudication could be used establish the existence of a predicate offense under section 186.22.

15

Ruizpaz's 2008 juvenile adjudication was also probative of his gang membership and of motive. " 'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.) Thus, evidence may be admitted to prove, among other things, motive. (Evid. Code, § 1101, subd. (b); see *People v. Williams* (1997) 16 Cal.4th 153, 193 [gang evidence can be relevant to prove motive].) In this case, the prosecution's theory was that Calderon was murdered as an act of retaliation by Sureños for the assault that was committed against Garcia. Evidence that Ruizpaz was a member of VTG, a Sureño subset, had a "tendency in reason to prove" (Evid. Code, § 210) that Ruizpaz had a motive to kill Calderon.

The issue is whether the probative value of the evidence was substantially outweighed by its potential for prejudice. In *Tran*, the California Supreme Court summarized several factors that can be considered when determining whether evidence of uncharged misconduct is unduly prejudicial and should be excluded under Evidence Code section 352 as follows: "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.] The potential for

16

prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*Tran*, *supra*, 51 Cal.4th at p. 1047, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405.)

*Tran* also noted that evidence of a gang-related prior conviction generally has "greater" probative value in a gang case because the prior conviction "provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity." (*Tran*, *supra*, 51 Cal.4th at p. 1048.) Moreover, the prejudice from the prior gang offense "typically will be less when the evidence is admitted to establish a predicate offense" than when it is admitted to prove "an intermediary fact from which guilt may be inferred," since a prior gang offense provides direct evidence of a violation of section 186.22. (*Tran*, *supra*, at p. 1048.)

Turning to this case, we analyze this issue by following the Supreme Court's direction in *Tran*. The probative value of Ruizpaz's juvenile adjudication was "enhanced" because the evidence emanated from sources that were independent of evidence of the charged crime of murder. (*Tran*, *supra*, 51 Cal.4th at p. 1047.) At trial, an officer who witnessed Ruizpaz drop the loaded firearm testified, and the parties later stipulated that Ruizpaz admitted to committing the offense. Evidence of Ruizpaz's 2008 juvenile adjudication was also "highly probative," since it provided evidence of a predicate offense and showed his active participation in a gang as well as his knowledge that the gang engaged in a pattern of criminal gang activity. (*Id*. at p. 1050.)

The evidence was also not unduly prejudicial. The jury was informed that Ruizpaz had been adjudicated of the offense when he was a minor, so the evidence would not have confused the issues and the jury would not have been inclined to punish Ruizpaz for the uncharged act. (*Tran*, *supra*, 51 Cal.4th at p. 1047.) Furthermore, the testimony describing Ruizpaz's possession of a loaded firearm was substantially less prejudicial

17

than the charged offense, where Ruizpaz was accused of shooting an unarmed man multiple times. (*Ibid*.) The potential for prejudice was further diminished because the trial court gave the jury a limiting instruction. The jury was instructed that evidence of gang activity should be used for the limited purpose of determining whether defendants had the requisite intent, purpose, or knowledge to satisfy the gang enhancement or gang special circumstance, and whether defendants had a motive to commit the charged crimes, and evidence of gang activity should *not* be used to determine that a defendant is a "person of bad character or that he has a disposition to commit crime."

Ruizpaz, however, argues that the evidence was more prejudicial than probative, citing to *People v. Barnwell* (2007) 41 Cal.4th 1038. *Barnwell* concluded that "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id*. at p. 1056.) In *Barnwell*, the trial court admitted evidence that the defendant had previously possessed a handgun similar to the murder weapon after erroneously concluding that the evidence was relevant to establish the defendant's identity as the murder and his propensity to own or carry that type of weapon. (*Ibid*.)

Unlike *Barnwell*, Ruizpaz's 2008 juvenile adjudication was *not* admitted to prove his identity as the shooter or his propensity to carry weapons. During closing argument, the prosecutor did not argue that Ruizpaz's 2008 juvenile adjudication demonstrated his propensity to carry firearms, or that it could be inferred from the juvenile adjudication that Ruizpaz was the shooter. In fact, the gun that Ruizpaz carried in 2008 was *not* the same as the gun used to kill Calderon.[15] Here, Ruizpaz's juvenile adjudication was admitted to prove, as the jury was so instructed, the elements of the gang enhancement,

---

[15] The gun involved in Ruizpaz's 2008 juvenile adjudication was a .357-caliber revolver. The gun used in Calderon's murder was a .25-caliber gun.

18

the gang special circumstance, and Ruizpaz's motive. The jury was instructed to use the gang evidence for this limited purpose, and "[w]e presume that jurors comprehend and accept the court's directions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Relying on *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*), Ruizpaz argues that his 2008 juvenile adjudication was purportedly offered to prove "motive" but was actually offered to prove his identity as the shooter. Unlike motive, to prove identity, an uncharged offense and the charged offense must " 'share *common features that are sufficiently distinctive* so as to support the inference that the same person committed both acts.' " (*Id*. at p. 393.) In *Earle*, the defendant was charged in two separate cases for indecent exposure and sexual assault. (*Id*. at p. 378.) The charges in *Earle* arose from distinct incidents and had no historical connection with each other. (*Ibid*.) *Earle* considered whether evidence of each offense would be cross-admissible to prove the other offense. (*Id*. at pp. 388-389.) In dicta, *Earle* stated that "[p]roperly understood, the motive for a crime is never an issue in its own right, but may operate as a basis to establish *identity* on the rationale that the defendant's possession of a *reason* (motive) to commit the charged offense increases the likelihood that he did so." (*Id*. at pp. 392-393.) *Earle* concluded that evidence of the indecent exposure had no tendency at all to prove that the defendant had the motive to commit the unrelated sexual assault. (*Id*. at p. 393.)

*Earle*, however, is distinguishable from this case. *Earle* did not consider the admission of relevant, uncharged acts to prove a predicate offense or motive in a gang case. Furthermore, as we have stated, the jury was specifically instructed to use the gang evidence *solely* to prove the gang enhancement, gang special circumstance, or motive. That the 2008 juvenile adjudication bore little similarity to the charged crime of murder did not render the evidence inadmissible. "[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) Evidence that Ruizpaz had previously carried a

19

gun in VTG territory tended to show his commitment to the Sureño gang and thus tended to show he had a motive to kill Calderon when he participated in the perceived act of retaliation against Norteños.  Officer Ashe testified that a Sureño who carries a gun tends to be someone "who's more down with the gang, someone who's willing to commit more violent acts; and, in turn, gets respect, more respect and more power within their gang."  The prosecutor never argued and the evidence was not admitted to show that the uncharged act and the charged offense were " '*sufficiently distinctive* so as to support the inference that the same person committed both acts.' " (*Earle*, *supra*, 172 Cal.App.4th at p. 393.)

Finally, Ruizpaz argues that evidence of his 2008 juvenile adjudication was cumulative of other evidence that was introduced at trial.  For example, there was evidence that Ruizpaz had admitted to being a VTG gang member.  There was also evidence of other predicate offenses committed by other Sureño gang members, including A.O.'s testimony that he stole cars, E.M.'s testimony that he had been arrested for attempted murder, and the parties' stipulation regarding Torres's prior juvenile adjudications.  Ruizpaz, however, "cites no authority for the argument that the prosecution must forego the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence." (*Tran*, *supra*, 51 Cal.4th at pp. 1048-1049.)  "When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion." (*Id*. at p. 1049.)

Here, the challenged evidence was probative to prove a predicate offense under section 186.22, subdivision (e) and to prove Ruizpaz's gang affiliation.  Given the trial court's limiting instruction, the dangers of confusing the jury was minimal.  Thus, the

trial court did not abuse its discretion under Evidence Code section 352 by admitting the evidence.[16]

## 2. *The Ex Parte Hearing*

Defendants argue that this court should review the sealed transcript of an ex parte hearing held outside the presence of defendants and their attorneys. Defendants argue that this court should review the transcript of the proceeding and determine if there was information that should have been disclosed to the defense. The Attorney General does not oppose defendants' request.

On March 10, 2017, after the jury reached its verdict and before defendants were sentenced, the prosecutor informed the trial court that it had received information that "relate[d] to [the] safety of persons" and requested an in camera hearing under section 1054.7. The trial court held an ex parte hearing outside the presence of defendants and their attorneys, and, after the hearing, stated on the record: "The Court does find that the content and the information does relate to the safety of individuals, and does not relate to the trial that occurred in this case or to any appeal issues in this case. [¶] And, so for those reasons, the information will not be revealed."

Under section 1054.1, the prosecutor must disclose any exculpatory evidence to the defendant or his or her attorney. In addition to the required statutory disclosures, " '[t]he prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant' when the evidence is 'both favorable to the defendant and material to either guilt or punishment.' [Citations.] Evidence is 'favorable' if it hurts the prosecution or helps the defense. [Citation.] 'Evidence is

---

[16] Ruizpaz also argues that admission of his 2008 juvenile adjudication violated his right to due process. However, we have concluded that admission of the evidence was an appropriate use of the trial court's discretion under Evidence Code section 352, and " 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.)

21

"material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' " (*People v. Earp* (1999) 20 Cal.4th 826, 866.)

We have reviewed the sealed transcript of the ex parte hearing and conclude that no relevant or material information was withheld from the defense.[17]

### 3. *The Firearm Enhancement*

Defendants argue that remand is required to permit the trial court to consider whether to exercise its newfound discretion to strike the firearm enhancements imposed in part of each of their respective sentences. Both defendants were sentenced to 25 years to life pursuant to the firearm enhancement under section 12022.53, subdivision (d). The Attorney General concedes that remand is required because the record does not clearly indicate how the trial court would have exercised its newfound discretion.

Senate Bill No. 620 (Senate Bill 620), effective January 1, 2018, gives the trial court new discretion to strike firearm-use enhancements under section 12022.5. Subdivision (c) of section 12022.5 now provides: "The court may, in the interest of justice pursuant to Section 1835 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 1.) The amendment to section 12022.5 applies retroactively to

_____

[17] Torres argues that it is unclear under what authority the trial court held the ex parte hearing. The prosecutor cited to section 1054.7 when requesting the hearing, but that section governs *pretrial* discovery. Defendants, however, do not argue that they were entitled to be present at the hearing or that their exclusion from the hearing violated their constitutional rights. Furthermore, "even where a court errs in proceeding ex parte, the error is not reversible per se" and is subject to a harmless error analysis. (*People v. Valdez* (2012) 55 Cal.4th 82, 125.) The information disclosed by the prosecutor during the ex parte hearing was not relevant to the case; therefore, assuming that it was error to hold an ex parte hearing, the error was harmless under any standard. (*Id.* at pp. 125-126.)

this case because the judgments against both defendants are not final. (*People v. Zamora* (2019) 35 Cal.App.5th 200, 207.)

Even though the amendment is retroactive, remand is not automatic. We must determine whether remand is required or if it would be an " 'idle act.' " (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901.) Generally, "when the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) The rationale for this general rule is that "[d]efendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*Ibid*.) However, where " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required.' " (*Gamble*, *supra*, at p. 901.)

In *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 (*McDaniels*), the Court of Appeal addressed the appropriate standard to "apply in assessing whether to remand a case for resentencing in light of Senate Bill 620." The court determined that "remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement." (*Ibid*.) If the trial court "express[ed] its intent to impose the maximum sentence permitted," remand was not required "because the record contains a clear indication that the court will not exercise its discretion in the defendant's favor." (*Id*. at p. 427.)

*People v. McVey* (2018) 24 Cal.App.5th 405 is illustrative of when remand for resentencing would constitute an idle act. There, in selecting the upper term of 10 years on the section 12022.5, subdivision (a) firearm-use enhancement, "the trial court

identified several aggravating factors, including the lack of significant provocation, appellant's disposition for violence, his lack of any remorse, and his 'callous reaction' after shooting an unarmed homeless man six or seven times. These factors, the court said, far outweighed any mitigating factors." (*McVey*, *supra*, at p. 419.) The court also described the defendant's attitude as " 'pretty haunting' " and commented that " 'the high term of 10 years on the enhancement is the only appropriate sentence.' " (*Ibid*.) Based on the trial court's statements, the Court of Appeal concluded that remand for resentencing under Senate Bill 620 "would serve no purpose but to squander scarce judicial resources." (*McVey*, *supra*, at p. 419.)

Here, the record does not contain "a clear indication that the court will not exercise its discretion" in defendants' favor. (*McDaniels*, *supra*, 22 Cal.App.5th at p. 427.) When it imposed defendants' sentences, the trial court made no comments about what it believed the appropriate sentence should be, or whether it would not have stricken the firearm enhancements if it had the discretion to do so. (*Ibid*.) Accordingly, we remand the matter for resentencing.

### 4. *The Gang Enhancement*

Defendants argue that the 10-year sentences for their gang enhancements that were imposed but stayed by the trial court should be stricken because they were sentenced to life in prison without the possibility of parole.[18] The Attorney General concedes that the gang enhancements should be stricken, and we accept the concession.

---

[18] Although Ruizpaz did not specifically argue in his opening brief that his gang enhancement should be stricken, he stated that he "join[ed] in . . . each issue and argument raised by [Torres] of potential relevance to [his] case." Torres argued in his opening brief that the sentence imposed but stayed for his gang enhancement should be stricken. In his reply brief, Ruizpaz argues that his gang enhancement should also be stricken.

Section 186.22, subdivision (b)(1) provides:  "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of . . . any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony . . . be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of section 667.5, the person shall be punished by an additional term of 10 years."  Murder is a violent felony under section 667.5, subdivision (c)(1).  Section 186.22, subdivision (b)(5) provides:  "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), the California Supreme Court determined that a defendant who commits a gang-related violent felony and is punished by life in prison is not subject to the 10-year enhancement under section 186.22, subdivision (b)(1)(C), but is instead subject to the 15-year minimum parole eligibility under section 186.22, subdivision (b)(5).  (*Lopez*, *supra*, at p. 1011.)  *Lopez* construed section 186.22, subdivision (b)(5) according to its plain meaning after finding that the language of the statute was unambiguous and applied to those defendants who have been sentenced to a life term.  (*Lopez*, *supra*, at pp. 1007-1008, 1011.)  Unlike here, however, the defendant in *Lopez* was not sentenced to life without the possibility of parole (LWOP); the *Lopez* defendant was sentenced to 25 years to life.  (*Id*. at p. 1005.)  Although there is language in *Lopez* that suggests otherwise, we determine that *Lopez*'s reasoning compels the conclusion that section 186.22, subdivision (b)(5) applies to defendants sentenced to life without the possibility of parole.

*Lopez* examined the history of the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.; STEP Act), and observed that the legislative history "stated repeatedly that section 186.22, former subdivision (b)(3) (now subdivision (b)(5))

25

applied to 'any life prison term.' " (*Lopez*, *supra*, 34 Cal.4th at p. 1010.)  But *Lopez* noted that the 1988 enrolled bill report by the Youth and Adult Correctional Agency, which analyzed the financial impact of the provision, stated:  " ' "This proposed provision relating to life terms [former section 186.22, subdivision (b)(3), now section 186.22[, subdivision] (b)(5)] would apply to all lifers (except life without possibility of parole)." ' "[19]  (*Lopez*, *supra*, at p. 1010.)  *Lopez* then stated that "at the time the STEP Act was enacted, the predecessor to section 186.22[, subdivision] (b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Lopez*, *supra*, at p. 1010.)  Generally, dicta from the California Supreme Court is highly persuasive, and " '[w]hen the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed.' " (*People v. Williams* (2018) 26 Cal.App.5th 71, 87.)  However, the *Lopez* court merely cited to some of the statute's legislative history and did not conduct an in-depth analysis of whether section 186.22, subdivision (b)(5) applies to sentences of life without the possibility of parole because that was not the issue before it.

Importantly, *Lopez* rejected the argument that the absence of a practical effect on a life sentence with a minimum parole eligibility of 25 years renders section 186.22, subdivision (b)(5) inapplicable.  (*Lopez*, *supra*, 34 Cal.4th at p. 1009.)  *Lopez* noted that Proposition 21, the voter initiative that amended the STEP Act, stated that " 'if any provision in this act conflicts with another section of law which provides for a greater

---

[19] "[A]n enrolled bill is one that has been passed by the Senate and Assembly but has not yet been signed by the Governor." (*Kaufman & Broad Communities*, *Inc. v. Performance Plastering*, *Inc.* (2005) 133 Cal.App.4th 26, 40.)  "While enrolled bill reports prepared by the executive branch for the Governor do not necessarily demonstrate the Legislature's intent [citation], they can *corroborate* the Legislature's intent, as reflected in legislative reports, by reflecting a contemporaneous common understanding shared by participants in the legislative process from both the executive and legislative branches." (*People v. Allen* (2001) 88 Cal.App.4th 986, 995, fn. 19.)

penalty or longer period of imprisonment that the latter provision shall apply, pursuant to Section 654 of the Penal Code.' " (*Lopez*, *supra*, at p. 1009.) Thus, *Lopez* determined that "the fact that section 190," which sets the minimum parole eligibility for first and second degree murder, "fixes a parole eligibility date equal to or greater than that provided by section 186.22[, subdivision] (b)(5) is neither an absurdity or an anomaly . . . ." (*Ibid*.) In such situations, "the greater penalty set forth in section 190—i.e., 25 years to life—is the proper punishment for defendant's first degree murder conviction." (*Ibid*.)

Like the 25-year-to-life sentence in *Lopez*, defendants' LWOP sentences will not be affected by the 15-year minimum parole eligibility imposed by section 186.22, subdivision (b)(5). This result, however, is neither absurd nor anomalous, and defendants will face the greater punishment of life without the possibility of parole for their convictions. (See *Lopez*, *supra*, 34 Cal.4th at p. 1009.)

We therefore conclude that under the language of section 186.22, subdivision (b)(5) and the California Supreme Court's reasoning in *Lopez*, the 10-year gang enhancements imposed against each of the defendants must be stricken.

5. *The Restitution Fines*

Defendants argue that the restitution fine that was imposed under section 1202.4, subdivision (b) should be reduced from $240 to $200, the statutory minimum at the time the murder was committed in 2010. Defendants claim that their counsels' failure to object to the imposition of the restitution fines below constituted ineffective assistance because the trial court stated its intent to impose the minimum amount.

a. *Background*

At the sentencing hearing, the Ruizpaz requested that the trial court "exercise [its] discretion and impose statutory minimums [with regards to the fines and fees] where possible in light of the sentence." The trial court granted Ruizpaz's request. The trial court thereafter asked the probation officer what the statutory minimum was for the

27

restitution fine under section 1202.4, subdivision (b), and the probation officer answered "$240." The trial court subsequently imposed "a restitution fine of $240 under the formula permitted by Penal Code section 1202.4[, subdivision] (b)(2), that is the minimum."

When it was time to sentence Torres, the trial court asked the probation officer if the "minimum" as to the restitution fine was $240, and the probation officer answered yes. Torres then requested that the trial court impose the minimum amounts for fines and fees, stating that he wanted "the same as [Ruizpaz] . . . regarding fines and fees." Thereafter, the trial court imposed "[a] restitution fine of $240 . . . under the formula permitted by Penal Code Section 1202.4(b)(2)."

Neither Torres nor Ruizpaz objected when the trial court imposed the restitution fines.

b. *Ineffective Assistance of Counsel*

To prevail on an ineffective assistance of counsel claim, a defendant must establish that trial counsel's performance was deficient and that defendant suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The deficient performance component of an ineffective assistance claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)

c. *Analysis*

In April 2010, when defendants committed the murder, the minimum restitution fine under former section 1202.4, subdivision (b)(2) would have been $200. (Stats. 2009, ch. 454 (A.B. 576), § 1, eff. Jan. 1, 2010.) Defendants argue that their attorneys' failure to object to the imposition of $240 fines constituted ineffective assistance of counsel because the trial court expressed its intent to impose the minimum amount.

We agree with defendants that their attorneys' failure to object below was ineffective assistance. (*People v. Martinez* (2014) 226 Cal.App.4th 1169, 1189-1190.) The record reflects that defendants' attorneys requested that the trial court impose the minimum restitution fine under section 1202.4, subdivision (b), and the trial court expressed an intent to do so. The trial court mistakenly imposed $240 when it was misinformed by the probation officer that the minimum restitution amount was $240. Accordingly, this is a situation where we can conceive of no tactical reason for trial counsel's failure to object below. (*Martinez*, *supra*, at p. 1190.) Moreover, it is reasonably probable that had an objection been made, the trial court would have imposed the $200 minimum that was in effect at the time defendants committed the offense. (*Ibid.*)

Accordingly, we direct the trial court to reduce the restitution fine under section 1202.4, subdivision (b) to $200 for each defendant.

6. ***Ability to Pay Fines and Fees***

Finally, defendants argue that, based on *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157, the trial court erred when it imposed certain fines and fees without considering their ability to pay them.

In this case, defendants argue that the trial court erred by imposing the following fines and fees without first determining their ability to pay them: a $40 court operations assessment (§ 1465.8), a $30 court facilities assessment (Gov. Code, § 70373), and a $129.75 criminal justice administration fee (Gov. Code, § 29550.1) payable to the City of San Jose[20] and a $240 restitution fine (§ 1202.4, subd. (b)). In the previous section, we

_____

[20] When it imposed the criminal justice administration fees as to both defendants, the trial court referenced three statutes, Government Code sections 29550, 29550.1, and 29550.2. The trial court, however, also specified that the fee should be paid to the City of San Jose, so we presume that the statutory basis for the fee was Government Code section 29550.1, which entitles cities to recover a criminal justice administration fee.

29

directed the trial court to reduce the restitution fine to the statutory minimum of $200 as to each defendant.  Defendants did not make an objection to any of the imposed fines and fees.[21]

The court operations assessment and the court facilities assessment are mandated by statute.  (§ 1465.8, subd. (a)(1) [court operations assessment of $40 "shall be imposed on every conviction"]; Gov. Code, § 70373, subd. (a)(1) [court facilities assessment of $30 "shall be imposed on every conviction"].)  Those statutes require imposition of the assessments without regard to a defendant's ability to pay.  (*People v. Kim* (2011) 193 Cal.App.4th 836, 842; see *People v. Woods* (2010) 191 Cal.App.4th 269, 272.)  Likewise, Government Code section 29550.1, which authorizes the imposition of the criminal justice administration fee, does not include an ability to pay requirement.

In *Dueñas*, the appellate court concluded that imposition of the court operations assessment (§ 1465.8) and court facilities assessment (Gov. Code, § 70373) without a determination of the defendant's ability to pay was "fundamentally unfair" and violated due process under the federal and California Constitutions.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)  The *Dueñas* court also concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine."  (*Dueñas*, *supra*, at p. 1164.)

The Courts of Appeal, including panels of our own court, have reached conflicting conclusions on whether *Dueñas* was correctly decided.  (See, e.g., *Santos*, *supra*, 38

_____

[21] The Courts of Appeal have reached different conclusions regarding whether a due process claim under *Dueñas* is forfeited if the defendant failed to object in the trial court.  (See, e.g., *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 206 [*Dueñas* claim forfeited]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031-1034 [due process objection based on *Dueñas* not forfeited]; *People v. Santos* (2019) 38 Cal.App.5th 923, 932 (*Santos*) [claim based on *Dueñas* not forfeited].)  We assume for the purposes of our analysis that defendants did not forfeit their due process claims under *Dueñas*.

Cal.App.5th at pp. 926-927 [applying the "principles articulated [in *Dueñas*]"]; *id.* at pp. 935-939 (dis. opn. of Elia, J.); *People v. Adams* (2020) 44 Cal.App.5th 828, 832 [concluding that "*Dueñas* was wrongly decided"]; *id.* at pp. 832-833 (dis. opn. of Premo, J.); *People v. Petri* (2020) 45 Cal.App.5th 82, 90 [finding that *Dueñas* was not "persuasive"]; *id.* at p. 95 (conc. & dis. opn. of Premo, J.).) The issue of whether an ability to pay determination must be made is currently pending before the California Supreme Court. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, 95 [agreeing with *Dueñas* that due process requires an ability to pay determination before imposition of court operations or court facilities assessment], review granted Nov. 13, 2019, S257844.) Pending the California Supreme Court's decision in *Kopp*, we continue to adhere to the position that *Dueñas* was incorrectly decided.[22]

Therefore, we conclude that the trial court did not err by imposing the restitution fine, court operations assessment, court facilities assessment, criminal justice administration fine, and the restitution fine without first finding that defendants had the ability to pay them.

### DISPOSITION

The judgment is reversed, and the matter is remanded for the limited purpose of allowing the trial court to consider whether to exercise its newly enacted discretion to strike defendants' Penal Code section 12022.53, subdivision (d) firearm enhancements. On remand, the trial court is further directed the modify the judgment as to both defendants by striking the 10-year gang enhancements (Pen. Code, § 186.22,

---

[22] *Dueñas* did not address criminal justice administration fees. However, our conclusion that *Dueñas* was incorrectly decided applies with equal force to defendants' arguments pertaining to the imposition of their criminal justice administration fees. Government Code section 29550.1 does not require the trial court to consider a defendant's ability to pay; thus, the trial court did not err by imposing the fee without determining defendants' ability to pay.

subd. (b)(1)(C)) and reducing the restitution fines (Pen. Code, § 1202.4, subd. (b)) to $200. If the trial court strikes any of the firearm enhancements, it shall resentence the defendant(s) accordingly. If the trial court declines to strike the firearm enhancement(s), the trial court will reinstate the original sentence(s) subject to the above modifications.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
GROVER, J.

*People v. Ruizpaz*
**H044593**